SECOND DIVISION
MARCH 1, 2011

No. 1-08-0323

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 04 CR 25947 |
| | ) | |
| JOHN HERMAN, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Karnezis and Harris concurred in the judgment and opinion.

**OPINION**

Following a bench trial, defendant John Herman was found guilty of multiple offenses relating to criminal sexual assault, official misconduct and kidnaping. The circuit court entered judgment on three counts of aggravated criminal sexual assault predicated upon official police misconduct, multiple counts of criminal sexual assault, two counts of kidnaping and five counts of official police misconduct. Defendant was sentenced to three consecutive seven-year prison terms for the aggravated criminal sexual assault to be served consecutively to a four-year prison term for kidnaping. Additionally, he was sentenced to concurrent 4- year sentences for the official misconduct counts, for a total of 25 years' imprisonment.

On appeal, defendant makes the following contentions: (1) the evidence was insufficient to

support his convictions; (2) the trial court made several erroneous evidentiary rulings which denied him a fair trial; and (3) the State engaged in impermissible double enhancement when it used the act of sexual penetration to establish official misconduct and again to aggravate the criminal sexual assault. For the following reasons, we reverse the judgment of the circuit court.

## I. BACKGROUND

Defendant's convictions arose from an encounter at 7759 South Peoria Street in Chicago. April M. Owney, a self-described crack cocaine addict, testified that she was sexually assaulted by defendant sometime after 5:25 a.m. in her bedroom on March 10, 2004, while defendant was on duty as a Chicago police officer. Defendant's theory at trial was that there was a consensual sexual encounter on the evening of March 9, 2004, prior to his being on duty, and that Owney had a motive to fabricate a rape for money to support her drug addiction.

Defendant was charged with three counts of aggravated criminal sexual assault premised on the display of a weapon (720 ILCS 5/12-14(a)(1) (West 2004)), three counts of aggravated criminal sexual assault premised on official misconduct (720 ILCS 5/12-14(a)(4) (West 2004)), three counts of aggravated criminal sexual assault premised on his being armed with a firearm (720 ILCS 5/12-14(a)(8) (West 2004)), two counts of aggravated kidnaping premised on his being armed with a firearm (720 ILCS 5/10-2(a)(1), (a) (3), (a) (6) (West 2004)), four counts of official misconduct premised on violations of police department rules and regulations, and one count of official misconduct premised upon the aggravated criminal sexual assault (720 ILCS 5/33-3(b) (West 2004)).

Because defendant challenges the sufficiency of the evidence against him, a complete

2

recitation of the facts adduced at trial is necessary to a disposition of the appeal. At the bench trial, Owney testified that she was a 42-year-old crack cocaine addict who had stopped using one month before trial. In March of 2004, she lived in a second-floor apartment at 7759 South Peoria Street in Chicago with her daughter, grandchildren and son-in-law. She sometimes smoked $80 to $100 worth of crack every other day. As she was not employed, she used money she obtained from babysitting her daughters' children and other children and her government social security check to purchase her drugs.

Owney began smoking crack in her home sometime after midnight on March 10, 2004. At about 1 a.m., while the family slept, Owney purchased two bags of crack for $20 from her delivery man in front of her apartment building and went back to her apartment to smoke. She initially testified that she remained in her apartment smoking until about 5 a.m. Despite her testimony from a prior deposition where she denied that she ever did "rocks," Owney acknowledged at trial that she was heavily under the influence of drugs during that night. At one point during her testimony, she stated that she had her "rocks" delivered and that it took her drug delivery man some time to get there, depending on how far away he was from the apartment. However, she later testified that she went out four or five times that night to buy "rocks." She originally testified she had smoked six to seven "rocks" of cocaine during the four-hour period from 1 a.m. until 5 a.m. and then later testified that she smoked six to eight "rocks" during that period.

On direct, she testified that at about 5 a.m., everyone was still asleep, and she telephoned her delivery man for more drugs using her daughter's cell phone. Her delivery man then delivered

a second batch of drugs. She began to smoke again, but then realized she had run out of cigarettes and alcohol, which she liked to use together with the drugs. Owney left the crack in the apartment on her bedroom dresser. She went out to get some cigarettes and alcohol from a "bootlegger," whom she described as someone who sold liquor from his house when the stores were closed. She then encountered defendant.

As she walked north on Halsted Street towards a gas station, a police car came southbound and made a U-turn going the wrong way down a one-way street. A police officer, alone in the vehicle, stopped her. Owney was about a half block from her home and across the street from the police station parking lot. The officer asked her what she was doing outside. She told him she was going to get some cigarettes. He then asked her if she was prostituting, and she said "no." He asked her if she had any identification. She replied that she did not have any identification on her person. He told her to get in the vehicle.

She testified at trial that she walked around the car and got in on the rear passenger side of the vehicle. When she got into the backseat of the police vehicle, she moved some papers and "stuff." She did not recall telling the police that she sat behind the driver's side. She was then impeached with her prior deposition testimony where she had testified that she got in and sat behind the driver's side. She did not see a black "boombox" radio on the back seat directly behind the driver's seat. She also testified that the vehicle had a cage in it and that it was not the first time she had been in a caged police vehicle. The other times she had been in a caged police vehicle she had to be let out by police because she was in handcuffs.

According to Owney, the officer then asked for her address and she told him where she

lived. He drove to her building and followed her up the stairs to her apartment. Owney identified defendant in court as the police officer that escorted her back to her apartment.

Owney unlocked the door to her apartment, and just inside the front door was the door to her bedroom, which was a few feet away from her daughter's bedroom. Owney was nervous because she remembered she left the crack in her bedroom and thought she would be arrested. They went into her bedroom and defendant closed the door behind him. She went to her dresser to get her identification out of her purse. She heard the sound of the nail that served as a latch to keep her bedroom door closed and she turned around. Defendant told her to take off her clothes. He had a gun in his hand down by the side of his leg. After being shown a photograph, she stated that it resembled a second small black gun defendant had in an ankle holster. She did not recall whether she told the officers at the police station that she saw a silver gun in the ankle holster. She took off her clothes. Defendant had undressed and she noticed he had an eagle tattoo. He told her to perform oral sex on him while the gun was still in his hand. He called her a bitch and a whore, forced her to lie down, and slapped her breasts. He then grabbed his nightstick, inserted it into her vagina, and then performed vaginal intercourse from behind her.

When defendant was finished, he took off a condom and threw it in her garbage. He also had a paper towel which he used to wipe off the nightstick and threw the paper towel in her garbage. He threatened to kill Owney if she told anybody about the incident. Owney crawled into bed and cried. Owney testified that she never consented to any of the sexual acts on March 10, 2004. She denied having ever met defendant prior to that day and denied ever having him in her apartment prior to that day.

She was not sure how long she stayed in bed crying, stating "it could have been an hour, two. I'm not for sure." She then took the condom out of the garbage and put it in her purse and left it there in her bedroom as proof that the officer raped her because she knew her "word was not good enough" because she was a crack addict and he was a police officer. She testified that she did not make an outcry to her family at the time the assault was happening because she was embarrassed and ashamed.

With respect to the timing of the encounter, she stated that she could not give an exact time as to when the assault occurred because she didn't look at a clock. However, after being shown cell phone records from her daughter's cell phone, she changed her testimony. She then stated that she telephoned her drug delivery man at 5:25 a.m. and that the assault occurred after that telephone call to her delivery man. She stated that she received her crack within less than 30 minutes from the time she called him because he was "always around." She then went back upstairs to smoke again, and realized she had run out of cigarettes and alcohol. She then left the apartment and was walking about three or four minutes when defendant stopped her on the street.

Owney denied telling any police officers that the assault happened between 3:30 and 4:30 a.m. She may have told police that the assault occurred sometime between 4:30 and 5:30 a.m., and then indicated, "I believe. I don't know. I believe I did. I said around about 5:00, 5:30." Owney recalled being interviewed by an Internal Affairs Division (IAD) investigator. When asked whether she recalled telling the IAD investigator that the assault occurred well before 5:30 a.m., she stated that she did not know what time she told the investigator. She did not believe that she told him a time. At a prior deposition, Owney was asked whether anything happened to her

sometime around 4 a.m. and then relayed the facts related to the encounter with defendant. The trial court appears to have admitted this evidence for its "limited" impeachment value.

Owney further testified that after the assault, she looked at her clock to see what time it was to determine whether the liquor store would be open. When she saw that it was 7 a.m. she left her apartment to go to the liquor store to get some alcohol, but the liquor store was closed. She then went to the police station to report the assault.

After arriving at the station sometime between 7 a.m. and 7:30 a.m., she told the police what had happened to her. She denied being "high" when she went to the police station. She was placed in a small room, where she testified she remained for hours. She kept telling them that she had been raped and that she needed to go to the hospital. They kept "badgering" her and "degrading" her and "talking about [her] and shit as if [she] wasn't nobody." At some point, she telephoned her brother from the station. Initially, she testified that a lawyer arrived and talked with her at the station, but she later stated that testimony was mistaken and that her attorney met her at the hospital.

After taking her to the hospital, Owney testified that the detectives took her to a liquor store. She initially stated that they purchased a beer for her, and then had her view a lineup at the 111th Street police station. Owney later testified that the beer was purchased after she left her apartment and not after she left the hospital. She then testified that the detectives did not purchase the alcohol for her at the liquor store, but instead gave her the money to purchase it. According to Owney, the detective asked her whether she needed something for her nerves. Owney told the detective she needed a beer and the detective bought her a beer.

7

Owney identified defendant in the lineup as the man who sexually assaulted her. After the lineup, she was alone in a room with a female African-American detective, the same detective that purchased the beer for her. Owney testified that the detective offered her a bribe of $5,000 and said, "You're going to be the first black woman's pussy worth $5,000." Owney denied ever asking the detective for a $5,000 payment to "make this go away." She denied ever "high-fiving" any of the investigators in the case. According to Owney, the detective attempted to bribe her and "high-five" her, but Owney never raised her hand to slap "high-five" with the detective.

During her interview with police, she initially refused to tell the police where the condom was out of fear. At some point at the police station, she called her neighbor to contact her daughter and instructed her daughter to hide the condom. Owney told her to get the condom out of her purse and to use her discretion to put it somewhere.

At trial, Owney also identified several exhibits which she described as photographs taken during the investigation when the police took her back to her apartment and made her "re-enact" the sexual encounter with defendant. Owney's lawyer, who was present at the apartment with a medical student, was taking the "re-enactment" photographs of her on her bed.

She denied giving police consent to search her house and stated that the consent form was signed by her daughter. Owney denied telling any officer that the assault occurred after she had gone out at 11 p.m. She acknowledged that she was with her neighbor Steve Slater "under the porch" sometime during daylight hours on either March 9 or 10.

Chicago police officer Geraldine Robinson testified that on March 10, 2004, she was assigned to the front desk at the sixth district police station. At about 7:15 a.m., Owney

approached the desk after turning around several times and looking out the window. Owney told her that she wanted to report that she was raped. When asked when it occurred, "[Owney] gave [Robinson] a time around 3:30, 3:45 a.m., somewhere within that window." At some point, Robinson was told to sit with Owney in an interview room. She provided Owney with a telephone and Owney made about 8 to 10 telephone calls. Owney never mentioned to her that the assault occurred after 5:30 a.m.

Owney's daughter, April Shontae Owney, testified that she was 21 years old at the time of trial. In March 2004, she lived with her children and her boyfriend at 77th and Peoria with her mother. She was not employed. She arrived home at about 11 p.m. on March 9, 2004. She testified that her mother was babysitting her children. However, her mother testified that she was babysitting her other daughter Erica's children and denied that she was babysitting April Shontea's children that evening. April Shontea further testified that she saw her mother leave the house at around 11:30 p.m. April Shontea went to sleep and was awakened at about 5 a.m. by her cell phone that she shared with her mother. When April Shontea went to her mother's bedroom to retrieve the phone, her mother was not there. April Shontea took the phone back to her room and answered it. She gave the phone to her boyfriend because the call was for him. She then went back to sleep.

She was awakened again at about 8:30 a.m. by the neighbor downstairs banging on her door. April Shontea's mother had called the neighbor asking to speak to April Shontea. After speaking to her mother, April Shontea returned upstairs, obtained her mother's purse from the bedroom floor and removed the condom which was wrapped in a tissue from the purse and put it

in her pants pocket. When police arrived she then signed a statement to allow a search of the house. After the police requested the condom, she took it out of her pocket and threw it on the dresser.

Several hospital personnel testified. Registered nurse Franklin Aniceto testified that he worked in the hospital emergency room in March 2004. He was on duty at about 9:30 a.m. on March 10, 2004, as a triage nurse working the front desk. During his interview with Owney, she told him that the assault happened around 4 a.m that day.

Virgilio Nidea III testified that on March 10, 2004, he was a registered nurse working in the emergency room at the hospital. In taking a history from Owney, she told him that a white officer picked her up at around 4 a.m. and took her to her apartment. She said the assault happened around 4:30 a.m. Owney told him she saw a name, "Herman." She told him that defendant "shoved" his nightstick "on" her vagina once. He had oral sex without a condom and then he had vaginal sex with her once while wearing a condom. She complained of pain.

Pacita DeJesus testified that she was a registered nurse working in the emergency room of the hospital on March 10, 2004. She prepared the sexual assault evidence kit for Owney. She reported no visible injuries.

Dr. Joseph Bajo testified that Owney presented to him in the emergency room on March 10, 2004. He took a history and she initially told him that the assault occurred at 4:30 a.m. on March 10, 2004. After examining her and asking her additional questions, she later told him the assault occurred at 5 a.m. He documented both times that she indicated to him. He did not document any complaint of pain. His examination revealed no lacerations, blood or discharge and

10

a normal anatomy for her body. His finding that there were no visible injuries could be consistent with either nonconsensual or consensual sex. Bajo indicated that a nightstick may not necessarily reveal injury; it depended on the type of force used and the size of the nightstick.

Lieutenant Gerald Koch testified that he was the watch commander in charge of the station on the midnight shift from 10 p.m. on March 9, 2004, to 6 a.m. on March 10, 2004. Defendant was assigned to beat 620 and was responsible as a field sergeant for monitoring crime conditions in the field. Based upon the police department attendance and assignment record, defendant was assigned to vehicle No. 8181. Generally, a field sergeant is supposed to attempt to make contact at least twice with each beat that is assigned to him. According to defendant's supervisor's log, defendant did not make personal contact with each member of his team during his shift based on their being no entry for beats 614 and 622. Generally, field sergeants are required to make entries on their logs every 45 minutes. Defendant's log did not have entries every 45 minutes. However, Koch did not know if defendant's log was accurate or how defendant handled his paperwork. Koch saw defendant at the sixth district police station sometime before midnight. At around 3 or 3:30 a.m., he and defendant had lunch together in the station in his office. Defendant left Koch's office at about 3:30 a.m.

Captain Joseph C. Vaclavik testified that he was the watch commander and captain on the day shift from 6 a.m. until 2 p.m. At about 7:30 a.m on March 10, 2004, he interviewed Owney. She appeared distracted, unfocused, and "not particularly fluent." She reported the sexual assault as occurring "sometime between 4 and 4:30 a.m." Owney told him that defendant had a small silver gun in an ankle holster. Vaclavik ordered defendant to the station at 7:45 a.m. and he

11

arrived at 8 a.m. When defendant arrived at the district, defendant did not have an ankle holster. Defendant's vehicle No. 8181, was a noncaged vehicle. Defendant's logs indicate that at 1:30 a.m. he was at 76th and Peoria and at 3:30 a.m. he was at 79th and Racine. Vaclavik did not know whether the logs were accurate.

Sergeant Tyrone R. Jordan, an investigator from the IAD of the Chicago police department, testified that he was assigned to investigate a case involving defendant. During his interview with Owney, she told him that she was raped around 3 or 3:30 a.m. and that she was offered a bribe. Jordan also testified that defendant was bound by the rules, regulations and general orders of the Chicago police department and that Rules 2, 10 and 36 were in effect at the time of the occurrence. Jordan further testified that Rule 36 was a "policy" in the department pertaining to having members of the opposite sex in a police vehicle. Defendant then stipulated to the contents of the rules. No evidence was presented on the process used to enact these particular rules or policies and no evidence was presented to establish by whom these rules were promulgated.

Evidence technician Michael Block testified that he recovered a condom wrapped in a "paper wipe" in a plastic bag from a dresser in Owney's bedroom. He did not observe any rock cocaine in the bedroom. Additionally, from the front bedroom he recovered paper towelettes, packaging for a condom, a cigarette butt, some bedding, and a robe. He photographed the door nail that was used as a "temporary lock" for the bedroom door. He also photographed the interior and exterior of police vehicle No. 8181. The vehicle did not have a cage. He observed a duffle bag in the front seat and recovered a nightstick from the vehicle. He processed the exterior

of the vehicle for fingerprints and submitted four fingerprints suitable for evaluation. He could not recall whether he processed the interior of the vehicle for fingerprints. He also recovered a "boombox" from the rear seat of the vehicle behind the driver's side. He did not recall inventorying an ankle holster from the vehicle.

Two DNA analysts, Jennifer Bell and Brian Schoon, were qualified as experts in forensic DNA and testified regarding their respective testing of the condom, towelettes and nightstick. Jennifer Bell testified that she found semen on the condom and one of the three towelettes. She also swabbed and tested the nightstick at the handle, the tip, and a third area for vaginal secretions. These test results were inconclusive. Bell further testified that defendant matched the male DNA profile on the condom and towelette. Owney could not be excluded as the second DNA profile on these items. Additionally, Bell found a swab from a part of the nightstick to be consistent with Owney's DNA profile. Schoon testified that the DNA profile from the tip and handle of the nightstick matched Owney. It was also stipulated that the fingerprints recovered from the squad car did not match defendant or Owney.

For the defense, retired Chicago police detective Ernest Bell testified that he had been a police officer for 30 years and a detective for 21 years. He was on duty on March 10, 2004, and was assigned to work on a case involving allegations against defendant. He and his partner, Detective Constance Besteda, met with Owney at the hospital. Owney's attorney was present. After counsel refreshed his recollection from a deposition taken April 3, 2007, Bell testified that Owney told him that the encounter with defendant occurred at about 10 p.m. on March 9, 2004, when she went out to get cigarettes. After his recollection was refreshed from the deposition, he

13

also testified she later told him that she went out at about 11 p.m. and the reason was not to purchase cigarettes, but to purchase drugs.

Bell further testified that Owney and her attorney wanted to go back to her apartment to show them where the assault took place. Before Owney informed Bell how the door "locked" with a nail, he did not observe anything that would lock the door to her bedroom. On the way from the hospital to her apartment, Owney went to the store to get some cigarettes. She came back with a drink in a paper bag and stood in front of the store and drank it. Bell smelled alcohol on her breath when she got back in the car. His police report did not reflect that Owney had drank alcohol. Neither he nor his partner gave Owney money to purchase the alcohol.

On cross-examination, Bell stated that he had never had a victim reenact the crime in a criminal sexual assault case, but that he has had victims demonstrate a crime to him quite a few times. He acknowledged that exhibits 13 and 14 were photographs of Owney with him behind her where she was reenacting the assault. His partner did not tell him that Owney had attempted to seek money in exchange for dropping the case. However, on redirect he stated that he subsequently learned that Owney had solicited a bribe, and that he reported it to his supervisors. On recross, he acknowledged that he was aware that bribery was a Class 2 felony. When asked why he did not immediately arrest Owney, he stated that it was an allegation which he reported to the supervisor in the office for further investigation. As a result of his reporting the allegation there was an investigation. When asked about the result of the investigation, the court sustained the State's objection, ruling that the result was not material.

Chicago police detective Constance Besteda testified that she had been a Chicago olice

officer for 22 years and an Area 2 detective for 12 ½ years. On March 10, 2004, she was assigned to investigate allegations of sexual assault against defendant. She and her partner went to the hospital to interview Owney. Owney's attorneys and a medical student were present on her behalf. After Detective Besteda's recollection was refreshed from her progress report, she testified that Owney told her that she went out and encountered defendant around 10 p.m. on March 9, 2004. Owney told her she was on her way to get something to eat. Besteda denied that she and her partner gave Owney money to purchase cigarettes. Owney returned from the store with some cigarettes and a tall can of beer. She drank it out of a paper bag. Besteda could smell alcohol on Owney's breath when she returned to the vehicle. Besteda did not stop Owney from drinking the alcohol and did not note it in her progress report.

Besteda then testified to a later conversation that day at the police station. She and Owney were sitting alone in the conference room. No formal interview was occurring. Owney indicated that she was tired of waiting around, and wanted to leave. Owney told her that "if he paid her, she could make this whole case go away." When Besteda asked her what she meant, Owney told her that if defendant paid her $5,000 she would tell everyone that it did not happen, and she would make the whole case "go away." Owney mentioned that the $5,000 would be "the most expensive piece of pussy that [defendant] had ever had."

Besteda testified that Owney thought that it was "kind of humorous" and Besteda thought that Owney said it in a humorous fashion. According to Besteda, Owney raised her hand and they slapped a "high-five." As a result of what Owney told her, Detective Besteda documented Owney's statement in her progress report and told her boss. She denied ever offering Owney any

15

amount of money during the investigation of the case. She specifically denied that she ever offered to pay Owney $5,000 and denied that she was lying to help defendant. Besteda acknowledged that she had arrest powers if she saw a crime being committed and that she did not arrest Owney for bribery. She also acknowledged that when there were allegations that she had attempted to bribe Owney there was an internal affairs investigation. When asked by defense counsel about the results of that investigation, the court sustained the State's objection, ruling that the results of that investigation had no bearing on the case.

Besteda further testified that she had known defendant for about five or six years. He was a supervisor on some cases that she worked on with other officers. She denied working with defendant directly on the "bus stop rapes," but acknowledged that in her deposition testimony she stated that she thought he was a good supervisor because of the way he handled the "bus stop rape" cases and because of the way he preserved the evidence. The individuals working under him were very professional and she thought it was a sign of a good supervisor. She further testified at trial that she worked with defendant's wife on occasion.

In the prior criminal sexual assault cases she had worked on, Besteda never had the victim re-enact the crime. When asked why it was that Owney had to reenact the crime, Besteda explained that they did not initiate the reenactment, stating "this wasn't our prompting." Besteda guessed that when they got to the apartment, Owney jumped on the bed and started showing them what had happened. This occurred after Owney had drank the beer. Besteda further acknowledged that exhibits 13, 14, and 15 were photographs of Owney and her partner Detective Bell.

16

On redirect, she testified that Owney's lawyer had the camera and was taking the pictures and that the detectives never asked Owney to perform any of the acts. Besteda indicated that nobody asked Owney to pose as depicted in the photographs. Besteda asked if the lawyer could stop taking the pictures because she did not want her picture on the Internet. There was also a medical student there with Owney's lawyers. The medical student was not providing any medical attention to Owney at the hospital or at her apartment.

Chicago police detective William Filipiak testified that he was assigned to investigate the allegations made against defendant and was the lead detective in the case. He interviewed Owney. Filipiak also went with the forensics experts to examine the car assigned to defendant. He observed an RCA radio in the backseat. He further testified that Owney was cooperative throughout the investigation until about 6:20 p.m. in the evening. He went to Owney's apartment and did not see any crack in the apartment. Owney did not sign a criminal complaint. The complaint was signed by Lieutenant Ramirez.

Defendant testified that he had been a sergeant with the Chicago police department for 10 years. He was 42 years old and was assigned to the sixth police district on Halsted Street. On March 9, 2004, he left his home about 10:30 p.m. and went to Owney's apartment in his own private vehicle. He was not on duty at the time. He was wearing his police issued blue pants, black shoes, a white T-shirt and a jacket.

He had met Owney quite a few times when she would go to the convenience store near the police station. He had previously stopped by her place, and had been inside about three weeks earlier, when they had sex together. They were "sex friends." On the previous occasion, she

17

invited him inside and he secured the door with a nail on the door frame. They engaged in foreplay, oral sex and intercourse. The foreplay included use of sex toys. He used a condom and took it with him after the encounter because he was unsure if Owney was "going to make any beefs, or you know, find my wife or anything like that."

On the morning of March 9, he saw Owney walking to the store as he was walking out of the police station. They had a conversation and she invited him over. When he arrived on March 9, shortly before 11 p.m., he honked his horn and flashed his flashlight into her bedroom window. She came to the door and they went inside. He was carrying his off-duty weapon, a snub-nosed .38-caliber revolver, which he wore in a holster on his belt. He was not wearing an ankle holster and denied owning an ankle holster. He also brought his nightstick, which she had asked him to bring. They went into her bedroom, and he secured the door with the nail in the door jam as she had shown him on their previous encounter. Defendant took off his clothes. Owney was wearing a black robe. They engaged in foreplay. Then, as Owney performed oral sex on him, she took his nightstick and rubbed it on her genitals. He denied penetrating her with the nightstick. They had vaginal intercourse and defendant wore a condom, which Owney provided to him. After they were finished, defendant placed the condom and some paper towels in a garbage bag that Owney was holding. He left the condom in her apartment because he felt it would be safe to do so, having spoken with her over the past three weeks. He got dressed and left for work at the station, which was a few minutes away.

He arrived at work at about midnight. His shift was from midnight to 8:30 a.m. He went to his locker, put on his vest, shirt, sweater and retrieved his duty belt. His Smith and Wesson

.45- caliber firearm was on his duty belt. He then went to the watch commander's office and left the station at about 1:15 a.m. He never encountered Owney during his shift and did not go back to her apartment at any time.

During his shift, he had an ongoing text messaging session with several dispatchers at the Office of Emergency Management and Communications on his portable data terminal located in his squad car. He was shown the State's exhibit 27 which was admitted into evidence which was the portable data terminal log. The log revealed ongoing text messages from defendant and the dispatchers between 3:48 a.m. until 4:50 a.m. He then received a text message at 5:28:52 stating, "hey, you forgot my Coke." Defendant explained that the message was referring to him not bringing a Coca-Cola up to the dispatcher when he was talking to them earlier at the communications center. He responded at 5:42:11 and sent another at 5:45:56 and again at 5:47:16. He next received a message at 5:54:57 from the dispatchers at the communications center. He replied at 5:55:18. He received another message at 5:56:00 and replied at 5:56:20. He then received a message at 5:57:53 and replied at 5:58:34.

He received another message at 6:00:45 and replied at 6:23:09. He explained that during that interval, he had left the Office of Emergency Management and Communications and stopped on 79th Street for coffee and a bagel. He stated that he used money that he had taken out of an ATM machine at about 4 a.m. He sent his next message at 6:23:37 and again at 6:24:48 and another at 6:25:37. He then received a message at 6:25:52 and replied at 6:26:35. The next messages were received at 6:44:45 and at 6:45:48. According to defendant, these two messages did not require a response because they were from his beat officers indicating that they had

written a stop sign ticket in the dock area for him to record in his log. He did not send out any messages during that period of time because the dispatchers he was talking to had ended their shift. He then received a flurry of messages between 7:43:10 and 7:44:49. He responded to the messages at 7:45:14. He did not complete his shift because he was called into the lieutenants office. He was asked to surrender his weapons. Neither of the weapons were in an ankle holster. He acknowledged that he was required to carry a nightstick while on duty and had it during his shift on March 10.

Defendant further testified that he never forced Owney to do any of the sex acts he described. He denied that Owney was ever in any of his police vehicles and denied that she was in his police vehicle No. 8181 on the morning of March 10, 2004.

On cross-examination, the State elicited no evidence from defendant that contradicted his version of the events of March 9 and 10. He acknowledged that his log sheet did not reflect entries for every forty-five minutes during his shift. He indicated that he met with officers under his command despite the fact that had not yet finished completing his log. He had only partially filled out his log with entries for 1:30 a.m, 1:50 a.m., 2:20 a.m., 3 a.m and 3:30 a.m. He acknowledged that he had an eagle tattoo on his shoulder. He was aware of the rules and regulations that bind every police officer and acknowledged receiving training on these rules and regulations. He acknowledged that his wife worked at a hospital with Detective Besteda, but explained that his wife did not work there until six months after the encounter with Owney. He never met any of Owney's family. He never gave Owney any gifts, but did give her $5 for cigarettes after their first encounter. The State presented no evidence in rebuttal. The parties

20

presented their closing arguments.

Prior to ruling on the charges, the trial court made the following findings with regard to the witnesses:

> "Before ruling it is also relevant to comment on two defense witnesses, Detective Bell and Besteda.
>
> * * *
>
> Their testimony is not believable or even remotely reasonable. Any witness-complainant who requested money to end their complaint would be more than likely arrested immediately. If any reason existed to not charge this person immediately it would be unreasonable that Detective Besteda would not pass this information on to other police officers involved in the investigation, her partner or the state's attorney. This fact, their participation in a reenactment of the alleged crime, their demeanor while testifying and Detective Besteda's working relationship with the defendant makes their testimony unbelievable and incredible and I reject it.
>
> * * *
>
> I have compared the manner in which both the defendant and Miss Owney testified and considered both of their testimony in light of all the other evidence in this case. The defendant's testimony is unreasonable and nothing short of perjury. Miss

> Owney's testimony, corroborated by the other evidence in this trial,
> is reasonable and believable despite minor inconsistencies."

The trial court initially found defendant guilty as charged on all counts of aggravated criminal sexual assault based upon three separate acts of sexual penetration, two counts of aggravated kidnaping and five counts of official misconduct. He found defendant not guilty of aggravated criminal sexual assault premised on the display of a nightstick.

Thereafter, defendant filed a posttrial motion, arguing *inter alia* reasonable doubt and that the trial court had shifted the burden of proof to the defense. In an effort to refute the trial court's finding that detective Besteda was incredible for failing to relate the bribe attempt to any other police officers, defense counsel was allowed, without objection, to introduce what he argued was newly discovered evidence by presenting the testimony of Robert Kuzas, an attorney for the policemen's association who was summoned to the station on behalf of defendant on March 10, 2004. Kuzas testified that he was in the interview room with defendant when Detective Besteda entered with her partner and reported Owney's statement that "for $5,000, this whole thing could go away." Kuzas told her that they were not interested in anything along those lines, that it must be documented, and that they should tell the watch commander. Kuzas and Besteda then explained the situation to the watch commander.

In denying the motion for a new trial, the court addressed the testimony of Kuzas and its impact on the court's ruling.

> "That testimony, in my mind, fits into my evaluation of the
> testimony of both those detectives. The conduct of that

22

investigation is questionable by the detectives assigned to this case, the manner in which they handled the investigation, Ms. Owney, the re-enactment of the crime for which there is photographs of their partici – one of their participation. The very fact that one of them was engaged in conversations with someone representing Mr. Herman about what witnesses were or were not saying, following directions from this attorney, these are things that fit into my evaluation of the believability of these witnesses.

So it's clear that my judgment at the time of the finding about the credibility taking into consideration the testimony of everyone in light of what the evidence was, was the correct one. And so as to those issues, the motion for new trial is denied."

Additionally, after reconsidering the evidence to support the convictions for aggravated criminal sexual assault premised on the weapon, the court found reasonable doubt in the testimony of Owney regarding the location of the weapons during the course of the assault. Accordingly, the convictions for aggravated criminal sexual assault premised on the weapon were reduced to the lesser included offense of criminal sexual assault (720 ILCS 5/12-13 (West 2004)) and merged with the aggravated criminal sexual assault counts premised on official misconduct (720 ILCS 5/12-14(a)(4) (West 2004)). Additionally, for the same reason, the aggravated kidnaping convictions premised on the weapon were reduced to the lesser included offense of kidnaping (720 ILCS 5/10-1(a)(1), (a)(3) (West 2004)).

1-08-0323

With respect to the convictions for aggravated criminal sexual assault premised on the nightstick and the firearm, the court found that since defendant was on duty at the time and legally armed, the legislature did not intend for these aggravated circumstances to apply to this case.

Defendant was ultimately sentenced to three consecutive seven-year prison terms for the offense of aggravated criminal sexual assault premised on official misconduct to be served consecutively to a four-year prison term for kidnaping. Additionally, he was sentenced to concurrent 4- year sentences for the official misconduct counts, for a total of 25 years' imprisonment.

## II. ANALYSIS

Defendant contends that the evidence at trial was insufficient to sustain any of his convictions based primarily on a lack of credible testimony and misstatements of evidence made by the trial court. When considering a challenge to the sufficiency of the evidence, the relevant question on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009). This standard of review applies, "regardless of whether the evidence is direct or circumstantial [citation], and regardless of whether the defendant receives a bench or a jury trial [citation]." *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

This court will not retry a defendant when considering a challenge to the sufficiency of the evidence. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Rather, it is our duty to carefully

24

1-08-0323

examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004); *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

However, the fact that a judge accepted the truth of certain testimony does not guarantee its reasonableness. *Smith*, 185 Ill. 2d at 545; *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991). As our supreme court has stated, "[r]easonable people may on occasion act unreasonably" (*Cunningham*, 212 Ill. 2d at 280) and, thus, although "a fact finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding" (*Wheeler*, 226 Ill. 2d at 115). "[A] reviewing court may find, after considering the whole record, that flaws in the testimony made it impossible for any fact finder reasonably to accept any part of it." *Cunningham*, 212 Ill. 2d at 283. Accordingly, we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Smith*, 185 Ill. 2d at 542.

Applying these principles to the present case, we examine the reasonableness of the evidence presented by the State in the light most favorable to it. After reviewing the whole record, we find that the evidence is so unsatisfactory as to justify a reasonable doubt of defendant's guilt.

At the outset, the physical evidence produced at trial was as consistent with defendant's testimony of a consensual encounter as it was with Owney's testimony of force. Thus, the State's case against defendant rested almost entirely on the credibility of Owney. Her testimony, taken in

25

the light most favorable to the State, was essentially that after smoking 6-8 rocks of cocaine, she encountered defendant sometime after a 5:25 a.m call to her drug dealer. While on duty, defendant induced her into his caged squad car, and drove her to her apartment on the premise that he needed to see her identification. He then sexually assaulted her orally, vaginally and with the nightstick, threatened to kill her if she told anyone, and left the condom and paper towels in her bedroom garbage. After crying for some period of time, she checked her clock to see whether the liquor store was open, went to a liquor store to get a drink, but when it was closed she then went to the police station to report the assault. There, police belittled her, offered her a bribe of $5,000 to make the case "go away," paid for her to purchase some alcohol, and then made her participate in a reenactment of the assault where her attorney took photographs.

Defendant specifically maintains that the trial court failed to give due consideration to the fact that Owney was a crack addict, that she had a motive to lie, that her testimony entirely lacked credibility, and contrary to the trial court's finding, was riddled with inconsistencies and contradictions and was completely uncorroborated.

With respect to Owney's drug addiction, the evidence revealed that she was an admitted crack addict, impeached with her deposition testimony that she did not do "rocks," and was admittedly "high" during the entire night of the encounter. It has long been held that this type of addiction is an important consideration in passing on the credibility of a witness " 'for *** testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars' " (*People v. Strother*, 53 Ill. 2d 95, 99 (1972) (quoting *People v. Boyd*, 17 Ill. 2d 321, 326 (1959))), and such evidence may cast serious doubt on the truth of

26

the balance of their testimony (*Strother*, 53 Ill. 2d at 99). Although this fact does not necessarily render her testimony unworthy of belief, it does bear upon her propensity for deceit and her capacity to observe, retain and relate information accurately. Therefore, the trier of fact was responsible for weighing this fact in its consideration of the evidence.

The trial court found, after stating that it considered the evidence including her drug use, that Owney's testimony was credible, "despite minor inconsistencies" and was "corroborated." In scrutinizing Owney's testimony, we find it was fraught with inconsistencies and contradictions, most notably related to the time line of events related to the encounter. The time line was material to Owney's credibility as it related to all of defendant's convictions.

When Owney initially reported the sexual assault, she told various witnesses, including police and medical personnel, that the encounter occurred anywhere from 3 a.m. to 5 a.m. At the time Owney initially reported the sexual assault to Officer Robinson, she told Robinson it happened at about 3:30 a.m. Owney then informed the watch commander that it took place sometime between 4 and 4:30 a.m. To the two medical personnel at the hospital, she reported to them initially 4 a.m., then to the attending physician she reported 4:30 a.m. and later 5 a.m. To the IAD investigator, she reported the encounter as being at 3 or 3:30 a.m. In her own prior deposition, when asked whether something happened to her at 4 a.m, she responded "yes," and then relayed the encounter with defendant.

The importance of these inconsistencies is evident when considering the uncontradicted evidence that during this entire time period defendant was able to verify his whereabouts from about 3 a.m. until 4:50 a.m. The watch commander testified that he had lunch with defendant at

27

about 3 a.m. or 3:30 a.m., and that defendant left his office at about 3:30 a.m. The texts sent from defendant's portable data terminal account for his activities between 3:48 a.m. and 4:50 a.m. Defendant could not have been at Owney's apartment during these earlier reported times because defendant was on the portable data terminal sending messages. It was also uncontradicted that between 5:28 and 5:58 a.m., defendant's whereabouts were again accounted for by the portable data terminal logs.

Then, at trial, Owney changed her time line. She initially stated that at around 5 a.m., she used her daughter's cell phone to call her drug dealer, and then left the apartment and encountered defendant. For the first time on cross-examination, she changed her testimony again, stating that the encounter took place shortly after she placed a telephone call from her daughter's cell phone to her drug dealer for more drugs, which was recorded in the telephone records at 5:25 a.m. For the first time, she testified that she left the apartment sometime after 5:25 a.m. and encountered defendant thereafter. This time period happens to coincide with the 25-minute gap in the transmission of text messages between 5:58 a.m. and 6:23 a.m., for which there is no independent corroboration of defendant's whereabouts.

However, Owney's trial testimony, that she encountered defendant sometime after placing a call to her drug dealer at either around 5 or at 5:25 a.m., was then entirely inconsistent with her daughter's trial testimony. Her daughter testified that she was awakened by the cell phone ringing in her mother's room a few feet away at about 5 a.m., that the mother was not there at 5 a.m., that the cell phone was shared by them, and that the daughter then gave the cell phone to her boyfriend. This testimony raises questions as to whether Owney was even home at that time and

28

as to how she could have made a call to her dealer at 5 a.m. or even 5:25 a.m. to support her time line of events. Contrary to the trial court's findings, these inconsistencies are not "minor" and shed significant doubt on Owney's testimony.

Furthermore, contrary to the trial court's finding that her testimony was corroborated, Owney's testimony regarding whether defendant was on duty and whether she was induced to enter into defendant's police car was not only uncorroborated, but was contradicted by other witnesses. In her previous sworn statement, Owney stated that she entered the police car and sat behind the driver's seat. However, at trial, she changed her testimony, stating that she walked around the car and sat on the rear passenger's side. Despite her testimony that she did not see a "boombox" on the driver's side, the evidence technician recovered a "boombox" on the driver's side rear seat when the car was sequestered that morning. Owney also described the vehicle as being caged, but defendant's police vehicle had no cage.

Her testimony on these points was important to her credibility generally, but was also highly relevant to the proof necessary to establish whether defendant was acting in his official capacity at the time of the occurrence. That proof was essential to his convictions for both aggravated criminal sexual assault premised on official misconduct (720 ILCS 5/12-14(a)(4) (West 2004)) and official misconduct (720 ILCS 5/33-3(b) (West 2004)). Whether Owney entered the police vehicle was also relevant to establish the offense of kidnaping under an inducement theory (720 ILCS 5/10-1(a)(3) (West 2004)).

Further inconsistencies in her testimony include her statement that defendant had a gun in an ankle holster, but no ankle holster was ever recovered. Although April Shontea testified that

Owney was babysitting her children on the evening of March 9, Owney testified that she was babysitting her other daughter's children and denied babysitting April Shontea's children that evening.

We recognize that it is for the fact finder to judge how these flaws in her testimony affect the credibility of the whole. However, the fact finder's judgment must be reasonable in light of the record. *Cunningham*, 212 Ill. 2d at 283. When taken together, these inconsistencies are not minor, as the trial court found but, rather, seriously undermine Owney's testimony on material points and when taken together raise unresolved questions about the whole of her testimony. See *People v. Yeargan*, 229 Ill. App. 3d 219, 230 (1992) (too many facts and circumstances in the record undermined the complainant's credibility).

Based on the evidence presented, and taken in the light most favorable to the State, we find that after considering the whole record, the flaws in Owney's testimony made it impossible for any fact finder reasonably to accept any part of it. *Cunningham*, 212 Ill. 2d at 283. See *Smith*, 185 Ill. 2d at 545 (no reasonable person could find the witness' testimony credible); *People v. Schott*, 145 Ill. 2d at 208-09 (complaining witness, an admitted liar with a motive to falsely accuse the defendant, was so thoroughly impeached court held her testimony insufficient to convict); *People v. Coulson*, 13 Ill. 2d 290 (1958) (conviction reversed where complainant's description of the crime was incredible on its face).

The trial court's ruling that Owney's account was credible was also premised in part upon its finding that the testimony of both Detectives Besteda and Bell was not "believable or even remotely reasonable." The trial court stated that the primary purpose of their testimony was to

impeach Owney and, if believed, would have offered strong impeachment. Besteda denied attempting to bribe Owney, and testified that it was Owney who sought $5,000 from defendant to "make the case go away." This testimony was offered as evidence of Owney's lack of credibility and motive to lie about the rape for drug money to support her addiction. The trial court rejected both Bell and Besteda's testimony, reasoning in part, as follows:

> "Any witness-complainant who requested money to end
>
> their complaint would be more than likely arrested immediately. If
>
> any reason existed to not charge this person immediately it would
>
> be unreasonable that Detective Besteda would not pass this
>
> information on to other police officers involved in the investigation,
>
> her partner or the state's attorney. This fact, their participation in a
>
> reenactment of the alleged crime, their demeanor while testifying
>
> and Detective Besteda's working relationship with the defendant
>
> makes their testimony unbelievable and incredible and I reject it."

Although we give great deference to the trial court's assessment of the detectives' demeanor (*Cunningham*, 212 Ill. 2d at 280), and there was some evidence to support a possible bias with respect to Besteda's relationship to defendant, the trial court's finding regarding the detectives' credibility was premised, in part, upon an improper and unreasonable inference. The trial court's reasoning, that had Owney indeed offered to "make the case go away for $5,000" she would have "more than likely" been arrested immediately and reported, is not grounded in the evidence but, rather, on the trial court's own perception of what was required under the

circumstances. This conclusion is mere speculation. Although the reviewing court must allow all reasonable inferences from the record in favor of the prosecution, a reviewing court may not allow unreasonable or speculative inferences. *Cunningham*, 212 Ill. 2d at 280.

Furthermore, the trial court misstated the facts. Contrary to the trial court's finding, the evidence revealed that Detective Besteda indeed documented the attempted bribe in her report and informed her supervisor of the conversation. As the trial court noted, Besteda's testimony on this point, if believed, would have severely undermined Owney's credibility and established a strong motive to falsely accuse defendant.

We further recognize that a trier of fact is not required to accept any possible explanation compatible with innocence and elevate it to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). However, the trial court's finding that defendant's testimony was "nothing short of perjury" was without explanation and unsupported by the record. Our review of the record reveals that, although contradicted by Owney, defendant's testimony was otherwise internally consistent, unimpeached and unrebutted after explaining a consensual encounter at about 11 p.m. on March 9 and explaining his whereabouts on the morning of March 10.

### III. CONCLUSION

As our supreme court has recounted, "[t]he adage that 'one bad apple spoils the lot' does sometimes describe the relation between specific flaws in a witness' testimony and the credibility of the whole." *Cunningham*, 212 Ill. 2d at 285. After carefully considering the whole record, this is such a case where the flaws in the testimony made it impossible for any fact finder reasonably to

accept any part of it. The record does not support the trier of fact's finding that Owney's testimony was credible and corroborated, "despite minor inconsistencies," or that defendant's testimony was "nothing short of perjury." Additionally, the trier of fact relied on an improper inference and misstated the evidence. Accordingly, based on this record, it is our considered judgment that defendant was not proved guilty beyond a reasonable doubt. Accordingly, the judgment of the circuit court is reversed.

Judgment reversed.