2021 IL App (1st) 180929-U

No. 1-18-0929

Fourth Division
March 18, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 17 MC 1206964 (01) |
| v. | ) ) | The Honorable |
| SHALINA ZAVALA, | ) ) | Robert Kuzas, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's judgment is affirmed where the evidence presented at trial was sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that defendant had committed theft and theft by deception, in that (1) defendant provided a customer with incorrect documents, including documents she had no authority to provide, (2) defendant overcharged the customer for those documents, (3) the money defendant admittedly accepted from the customer was never turned in to the city, and (4) no receipt was issued and defendant took steps to conceal any evidence of the transaction.

¶ 2    After a bench trial, defendant Shalina Zavala was convicted of theft (720 ILCS 5/16-1(a)(1) (West 2016)) and theft by deception (720 ILCS 5/16-1(a)(2) (West 2016)) for knowingly

obtaining by deception control over $40 from Pedro Texta and failing to tender that money to the Chicago Police Department. Defendant was sentenced to 30 days of court supervision and now appeals, claiming that the evidence was insufficient to prove either charge beyond a reasonable doubt. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        On May 3, 2017, defendant, who worked as a clerk in the public records division of the Chicago Police Department, was charged with multiple counts of theft and theft by deception, all based on allegations that she had, on several occasions, taken money from individuals seeking documents and (1) had given them improper documents and (2) failed to turn the funds over to the police department. During a bench trial, the trial court granted defendant's motion for a directed finding on several of the counts, and defendant was found guilty only on the counts concerning Pedro Texta. Accordingly, we relate only the facts relevant to the counts at issue on appeal.

¶ 5        At trial, Texta testified that on December 16, 2016, he was in the process of completing an immigration application and went to the police headquarters on South Michigan Avenue to obtain some paperwork he needed for the application, including a clearance letter and a rap sheet. He was accompanied by his girlfriend, Blanca Urrostegui; Texta's primary language was Spanish, but Urrostegui spoke English. He and Urrostegui approached a worker and informed her that he needed his arrest records, showing her a copy of a letter that the immigration office had sent him, and testified that the worker, who had a "bad attitude," handed him some paperwork. He and Urrostegui went to a table and looked at the paperwork, then approached a different worker, who was at the fingerprint counter. After speaking with that worker, he again approached the first worker and informed her that the paperwork he was given

was incorrect. Texta testified that the worker "gave [Urrostegui] an attitude," and refused to help them, saying she had no time. Defendant then approached and "very courteous[ly]" informed Texta and Urrostegui that she would now be taking care of them.

¶ 6 Texta gave defendant the letter from the immigration office, and defendant gave him two sets of papers and told him that additional paperwork would be mailed to his home; he identified the documents as two clearance letters—one for his name and one for an alias—and a rap sheet. Texta was not fingerprinted before he received the documents. Defendant asked for $40, which Texta paid in cash. Approximately 10 to 15 minutes after receiving the paperwork, Texta and Urrostegui returned to his vehicle, and Urrostegui asked Texta if he had a receipt. Texta noticed that he did not have one, so Urrostegui went back inside to request one; Texta had not checked for a receipt before leaving the building, nor had he asked any of the workers for one. Texta remained in the vehicle, waiting for Urrostegui, when he received two phone calls from the same number. He did not answer the first call, but when he answered the second one, he recognized defendant's voice as the caller; defendant asked Texta where Urrostegui was, but he did not know.

¶ 7 Texta testified that, after Urrostegui went back inside the police station, he eventually had a conversation with a detective about what had occurred and was fingerprinted and given new documents. The detective told Texta that he did not have to pay for the new documents.

¶ 8 Urrostegui testified that, on December 16, 2016, she accompanied Texta to the police headquarters on South Michigan Avenue to obtain documents Texta needed for his immigration application. When they arrived, Urrostegui walked to one of the windows and gave the worker the letter from the immigration office identifying the documents they needed, and the worker "threw" a document at her. Urrostegui and Texta went to a table and looked at

the document but were confused, because it asked for irrelevant information. Urrostegui then approached a different worker, at the fingerprint window, who told them they had the incorrect paperwork. Urrostegui then obtained the correct paperwork from the first worker but, when she tried to return the filled-out paperwork, the worker refused to help her anymore. Defendant, who was standing nearby, told Urrostegui "in a really nice and calm way" that she would help.

¶ 9      Urrostegui gave defendant the letter from the immigration office. Defendant looked at the letter, then gave Urrostegui several sheets of paper, which defendant placed in an envelope, and informed Urrostegui that the remainder of the paperwork would be sent through the mail. Texta was not fingerprinted prior to receiving the documents, which Urrostegui identified as a rap sheet and two clearance letters. Urrostegui asked if there was any cost, and defendant replied that it was $40, which Texta paid; they did not receive a receipt for the payment. When Texta gave defendant the money, Urrostegui observed defendant walk behind the counter and retrieve something from the printer; when she returned, Urrostegui did not observe any money. When they returned to their vehicle, Urrostegui asked Texta where the receipt was, and began looking through the envelope for a receipt. When she discovered they did not have one, she decided to go back and request a receipt. There was no one at the window, so Urrostegui returned to the woman in the fingerprint window and asked her to call defendant. Urrostegui asked defendant for a receipt, but defendant was unable to provide one. Urrostegui asked to speak with a supervisor, and Urrostegui then spoke to Sergeant Debra Molloy. After speaking with Sergeant Molloy, Urrostegui learned that Texta needed to obtain different documents, for which he was fingerprinted; Urrostegui testified that Texta was required to pay an additional $10 for the documents.

¶ 10        Detective Cheryl Pontecore testified that she worked for the internal affairs division of the Chicago Police Department and had been assigned to work on defendant's case, which involved three instances in which individuals came to the records division to request criminal records with respect to immigration proceedings. After reviewing the case reports, Pontecore contacted the victims and had an independent detective show them a photo array. Both Texta and Urrostegui identified defendant from the photo array, but the other victims were unable to make any identifications.

¶ 11        Defendant was brought in for questioning and was advised of her *Miranda* rights. Defendant denied any wrongdoing, and denied taking any money for her own personal gain. Defendant informed Pontecore that she had worked in the records division for 10 years, and that she "wore many hats" in her work, but that her official title was as a data entry operator. Defendant further informed Pontecore that there were occasions where no cashiers were available, so she needed to act as one, and that she wrote out receipts on occasion. Defendant recalled taking money from Texta for his documents, but told Pontecore that any money she had taken had been turned in. Pontecore testified that no audit had been performed on the cashier's computer.

¶ 12        Sergeant Debra Molloy testified that she was the supervisor of the data entry operators in the records division and was present on December 16, 2016. Molloy explained that the customer service section of the division was open to the public and had seven windows, each serving its own purpose. On December 16, 2016, defendant was working at window 5, a window that was responsible for the issuance of visa clearance letters, which were often used for immigration purposes and which cost $5. Workers at window 5 would deal primarily with issuing clearance letters but, if they did not have any customers, might assist other workers in

areas such as redacting reports or finding case reports. Workers at window 5 would not have any responsibilities involving the handling of money, nor would they have any responsibilities issuing rap sheets; the cashier at window 3 handled money, while window 1 performed fingerprinting for the rap sheets. Molloy testified that if someone needed a rap sheet, they would go to window 1 to be fingerprinted, then would be sent to the cashier to pay the fee, which was $16. They would then return to window 1, where they would be informed that they needed to return in a week to pick up the rap sheet. The rap sheet would not be issued immediately.

¶ 13    Molloy testified that on December 16, she was called to the customer service counter because someone was upset that they had not received a receipt for some paperwork; Molloy recalled that the upset person was named Blanca. Based on the complaint, Molloy began an investigation. Molloy testified that the transaction at issue involved the issuance of a rap sheet and two clearance letters, which were "all incorrect." Molloy testified that two clearance letters should not have been issued, as they did not issue clearance letters for aliases. Additionally, the rap sheet issued did not show that Texta was fingerprinted, and did not contain an "access and review" stamp. The rap sheet also had an improperly redacted "PC" number on two of its three pages, which was used to identify the worker who issued the document. From the page that was not redacted, Molloy was able to identify defendant's PC number; Molloy testified that using someone's PC number required knowing both the PC number and a password. Molloy further testified that the correct version of the paperwork would have cost $21—for one rap sheet and one clearance letter—but Texta paid $40.

¶ 14    Molloy asked the cashier if there was any receipt for the transaction, but was unable to recover a receipt. Molloy observed that there was paperwork in a trashcan near the place where

defendant was sitting, which consisted of a printout of Texta's rap sheet. Molloy also asked defendant where the receipt was, and defendant stated that she had placed the money near the cashier; Molloy testified that there was no money near the cashier, and, in her experience as a supervisor, it would not be normal for an employee to leave money near the cashier. After completing her interviews, Molloy initiated a "CR," or complaint register, number, which documented that there had been an allegation of misconduct against an employee. Molloy testified that the $40 was never recovered.

¶ 15      On cross-examination, Molloy testified that, while she had been a supervisor for approximately seven years, she was not on the floor every day and her office was not in the same area as the customer service counter. Molloy testified that defendant had worked in the records division for over 10 years—longer than Molloy had been working there—and that defendant had been cross-trained to work several different positions. Molloy testified that it was not uncommon for PC numbers to be redacted, but that they were redacted only on case reports, not on rap sheets.

¶ 16      Molloy testified that, as part of her investigation, she briefly spoke with the employee who had first worked with Texta and Urrostegui, and learned that there had been difficulties with them. Molloy was aware that Texta and Urrostegui had separated after the transaction, since there were screenshots of defendant calling Texta, but was unaware that both Texta and Urrostegui had left the building before Urrostegui returned to ask for a receipt. Molloy testified that defendant was not searched at the time of the incident, as she was not under arrest, nor were her desk or her purse searched.

¶ 17      On redirect, Molloy testified that, if Texta had been given a receipt, there would be a record of the receipt. Molloy explained that the receipt was a three-page form filled out by the

customer, and the customer kept a copy, the cashier kept a copy, and the unit kept a copy. She testified that no receipt was found for Texta's transaction. Molloy further testified that the department of finance at City Hall reconciled the division's receipts on a daily basis, which would reveal whether there was an overage or a shortage in the cash registers, and there was neither an overage nor a shortage on December 16, 2016.

¶ 18    On recross, Molloy answered in the affirmative when the court asked her if there was "a possibility that the cashier did not do her job properly that no receipt would have shown up and the money could have disappeared." Molloy admitted that defendant claimed that she left the $40 near the cashier, and that if that was the case, "anyone could have picked it up right behind the counter." However, Molloy testified that "no one has ever done that."

¶ 19    Charlotte Ingersol testified, on behalf of defendant, that she was retired but had worked in the records division for 25 years, ending as an assistant supervisor. Ingersol testified that the customer service counter was very busy and crowded, and that all of the workers had been instructed to assist each other when necessary. Ingersol was working on December 16, 2016, and recalled it being "crazy busy." Ingersol further testified that she had worked as a cashier at times, and "frequently" had instances where defendant either left money for her or handed her money. In such situations, Ingersol would not issue a receipt until the payment had been processed, and would call out the customer's name in order to give them the receipt.

¶ 20    Ingersol testified that defendant was not the only employee who left payments for the cashiers and that she was aware of at least one other employee who did so. Ingersol testified that Molloy herself had done so on occasion:

> "We would have a place set up next to the cash register, which was out of the reach of the public, where she would either [set] it there or she would hand it to me directly,

especially when we had a lot of people and we were trying to move them out because there was no room in the lobby itself."

Ingersol testified that placing money near the cashier was not the proper procedure, but that it nevertheless occurred "daily." On examination by the trial court, Ingersol testified that if a worker left money, they would also leave the paperwork with the money, either paper-clipped or sitting on top of the money.

¶ 21    After both parties rested, the trial court found defendant guilty of both theft and theft by deception. The court found that defendant had been cross-trained on the different jobs behind the counter, and knew what to do in various cases, but that "[n]one of that was done." The court further found that defendant admitted to taking the $40, but that she claimed she placed it near the cashier. The court noted that Molloy performed no further investigation on the date of the incident other than interviews, but found that she would not have been able to do anything more, as defendant was an employee of the department at that time. The court found: (1) defendant's PC number appeared on the documents given to Texta; (2) there was a three-page receipt that should have been issued, including copies kept by the cashier and within the department; and (3) there were additional documents with defendant's PC number on them in the garbage can at her workstation. Consequently, the court found defendant guilty of both counts.

¶ 22    Defendant filed a motion for a new trial, which was denied, and was sentenced to 30 days of court supervision. Defendant filed a timely notice of appeal, and this appeal follows.

¶ 23                                          ANALYSIS

¶ 24    On appeal, defendant argues that the evidence was insufficient to prove her guilty beyond a reasonable doubt. When reviewing the sufficiency of the evidence in a criminal case, we

9

must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *People v. Smith*, 185 Ill. 2d 532, 541 (1999)).

¶ 25     In the case at bar, defendant is challenging her convictions for theft and theft by deception. Under the Criminal Code of 2012, a person commits theft when she knowingly "[o]btains or exerts unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (West 2016). A person commits theft by deception when she knowingly "[o]btains by deception control over property of the owner." 720 ILCS 5/16-1(a)(2) (West 2016). Additionally, for both types of theft, the State must prove that the defendant "[i]ntends to deprive the owner permanently of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A), 16-1(a)(2)(A) (West 2016); *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 163. "Evidence of intent to permanently deprive the owner or property may be inferred from the facts and circumstances surrounding

10

the theft, including the act of the theft itself." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31.

¶ 26    Defendant claims that, while she accepted $40 from Texta, there was no evidence that she committed either theft or theft by deception. Specifically, she claims that there was no evidence that she obtained the money from Texta by deception, and there was no evidence that she intended to permanently deprive the city of the money. Taking the facts in the light most favorable to the State, we do not find either of these arguments persuasive.

¶ 27    With respect to obtaining the money from Texta by deception, both Texta and Urrostegui testified that Texta sought certain documents required by the immigration office, which were detailed in a letter that they presented to defendant. Molloy's testimony established that defendant gave Texta two clearance letters, one of which was improper because it was issued in the name of an alias, and a rap sheet, which was incorrect because it was issued without Texta's being fingerprinted and without an "access and review" stamp. Molloy further testified that defendant did not have the authority to issue rap sheets and improperly redacted her PC number from two of the pages of the rap sheet, concealing her identifying information. Additionally, there were no copies of a receipt located, either with Texta or within the department, despite the fact that receipts were issued in triplicate and there would have been three copies, had such a receipt been issued. Finally, Molloy testified that the price of a rap sheet was $16, while the price of a clearance letter was $5. Had Texta been issued the correct documents, he would have owed $21. However, defendant charged him $40, nearly double that amount (and an amount that is above even the $26 that would have been owed if the issuance of two clearance letters was permitted). Thus, the evidence establishes that, in response to Texta's request for official documents that could be used in his immigration

application, defendant gave him incorrect documents and overcharged him for them. Furthermore, the evidence establishes that, through the redacting of the PC number and the lack of a receipt, there would have been no trace of the transaction or defendant's role in it, had Urrostegui not pursued the matter when she noticed there was no receipt.

¶ 28    Defendant attempts to paint her conduct in issuing the documents as inadvertent errors that could be resolved through better training, pointing to the fact that Texta had also received incorrect documents when he approached the first worker. As noted, it is not our role to retry the defendant or to substitute our judgment for that of the reviewing court on issues of credibility. *Jackson*, 232 Ill. 2d at 281. However, even if we were to accept her claim that a 10-year employee would not know that clearance letters could not be issued for aliases or that rap sheets required fingerprinting, such errors would still not explain the lack of a receipt or the overcharging for the documents. Taking all of the circumstances together, and viewing them in the light most favorable to the State, we must conclude that a rational trier of fact could have determined, beyond a reasonable doubt, that defendant obtained $40 from Texta by deception.

¶ 29    Similarly, we find that a rational trier of fact could have found, beyond a reasonable doubt, that defendant intended to permanently deprive the city of the money. Again, defendant focuses on the department's lax procedures, pointing to Ingersol's testimony that it was common for workers to place money near the cashier's desk, and claims that there was no evidence that she was the one who took the money. She also points to the fact that Molloy testified that it was possible that the cashier had performed her job improperly. However, Ingersol testified that, even when the cashier did not accept the money directly from the customer, the worker leaving the money would leave the paperwork for the transaction with the money. Thus, even if

defendant had left the money near the cashier, there would have been some evidence of the transaction. Additionally, Molloy testified that the receipts were reconciled by the city's department of finance every day, and that there was no overage or shortage found on the day of the incident, suggesting that the transaction was never processed at all.

¶ 30     While defendant correctly notes that the money was never recovered on her person, but there is no evidence that she was ever searched. Circumstantial evidence is sufficient to sustain a conviction. See *People v. Campbell*, 146 Ill. 2d 363, 379 (1992) ("Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged."). Moreover, the fact that defendant was able to put forth an alternate theory that someone else took the money did not require the trial court to accept that explanation. See *Campbell*, 146 Ill. 2d at 380 ("[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from evidence before it [citation], nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt [citation]."). In the case at bar, taking all of the facts and viewing them in the light most favorable to the State, a rational trier of fact could determine, beyond a reasonable doubt, that defendant kept the $40 paid by Texta and intended to permanently deprive the city of the money. Accordingly, we affirm defendant's convictions on both counts.

¶ 31                                  CONCLUSION

¶ 32     The trial court's judgment is affirmed, where the evidence presented at trial was sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that defendant had committed both theft and theft by deception in taking $40 from Texta and failing to turn that money over to the city.

¶ 33     Affirmed.

13