NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190399-U

NO. 4-19-0399

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| SCOTT A. FOSS, | ) | No. 17CF1666 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence presented by the State at trial was sufficient to support defendant's convictions for criminal sexual assault and criminal sexual abuse beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant, Scott A. Foss, was found guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)) and criminal sexual abuse (*id.* § 11-1.50(a)(1)). The trial court sentenced him to consecutive terms of nine years and one year in prison, respectively. Defendant appeals, arguing the State failed to prove him guilty of either charged offense beyond a reasonable doubt. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    In November 2017, the State charged defendant with one count of criminal sexual assault (*id.* § 11-1.20(a)(1)) and one count of criminal sexual abuse (*id.* § 11-1.50(a)(1)). It alleged

that on or about February 26, 2017, defendant, "by the use of force or the threat of force" (1) made contact between his sex organ and the sex organ of F.S. and (2) transmitted his semen onto F.S.'s body.

¶ 5        In September 2018, defendant's jury trial was conducted. The State's evidence showed that in 2016 and 2017, the victim, F.S., and her two children resided at 2706 Dale Drive in Champaign, Illinois, with her fiancé, Donald Carlock. From approximately December 2016 to March 2017, defendant also resided in the home. F.S. testified defendant moved into the Dale Drive residence to help with expenses after she and Carlock were "in a really bad car accident" and could not work. She described defendant as being "best friends" with Carlock and stated that she had known defendant for three or four years before he moved in. F.S. acknowledged that when she first met defendant, she texted back and forth with him and the two attended a concert together. However, she asserted the two "just stayed friends" and did "[n]ot really" ever date.

¶ 6        F.S. testified that in early 2017, a doctor prescribed her medication—Seroquel and Prozac—for anxiety and depression. She took her medications at night and described them as "very strong," stating they prevented her from "get[ting] up to walk and go to the bathroom." After taking her medications, F.S. would go into her bedroom and lock the door. She testified that "on a couple of different occasions," when Carlock had left the residence for work or to visit his father's house, defendant unlocked her bedroom door and engaged in sexual activity with her. F.S. explained that the bedroom doors in the residence could easily be unlocked with "a card or a butter knife." She further testified as follows:

> "[Defendant] would come in, he would lift my shirt up, he would pull my pants down. He would sit on my back and on my legs and he would hold me there. He

- 2 -

would tell me that everything was okay and that if I said anything, that he would make sure that nobody would believe me."

¶ 7 F.S. provided more detail regarding an occurrence on the evening of February 26, 2017. On that occasion, she was home with her children and defendant. At approximately 9:30 or 9:45 p.m., she took her medications. Around 10 p.m. she went to bed because that was when her medications would start to "kick[ ] in" and she "couldn't do anything after that." F.S. testified she locked her bedroom door and went to bed alone. She remembered waking up to defendant sitting "on top of [her], masturbating." F.S. testified her shirt was pulled up and her pants were pulled down. She stated she asked defendant several times to "leave [her] alone, get out of [her] room, [and] stop." She told him she had a boyfriend and "[i]t wasn't right." According to F.S., defendant stated what he was doing was "his fantasy" and "something that he'[d] always wanted to do to [her]."

¶ 8 F.S. testified she was lying on her stomach and defendant was positioned on her butt and legs, sitting on top of her. Defendant also had a hand placed on her back in the area of her shoulders, "holding [her] there with one hand" while he masturbated with the other. F.S. described defendant as bigger and stronger than herself, stating she weighed 94 pounds and was five feet and five inches tall. She knew defendant was stronger because she tried to move but could not while he was on top of her. F.S. testified defendant was "holding [her] down" and "applying pressure" with the hand on her back.

¶ 9 F.S. indicated that during the February 26 incident, defendant attempted to engage in sexual intercourse with her. Specifically, she stated defendant "had his penis in between \*\*\* [her] butt and [her] vagina and [her] leg area," trying to vaginally penetrate her. F.S. testified she

felt defendant's penis touch her vagina. However, she was able to "move" or "squirm enough" that defendant was unable to penetrate her. Ultimately, defendant "lifted up" and ejaculated, getting his semen on F.S.'s back. F.S. testified that afterwards, defendant "forced [her] up" and "made [her] go take a bath." During the bath, defendant "washed [her] back and everything else." F.S. stated as follows:

> "[Defendant] grabbed me and stood me up, and he walked me to the bathroom. *** I was unable to walk whenever I took my medicine. If I did walk, I would bounce off of every wall in the house. I felt like I was extremely drunk whenever I took my medicine."

¶ 10 When asked whether her medications prevented her from remembering what happened, F.S. stated: "Pieces and parts I remember." F.S. expressly denied that the sexual contact with defendant was consensual and stated she did not want it to happen and never told defendant that what he was doing was okay.

¶ 11 F.S. reiterated that what occurred during the February incident had happened before in December 2016 and January 2017. Each time, she was on her medication. After the last occurrence on February 26, F.S. quit taking her medicine. She stated she did not immediately tell anyone what was happening because she was "terrified," "scared," and "afraid nobody would believe [her]." She testified she had "been a victim before and *** nobody believed [her]." Also, F.S. stated she was worried about not having a place to live for herself and her children, and she noted defendant "was helping with the bills." She testified: "I would have lost everything along with losing my dignity at the same time."

¶ 12 Eventually, while at the Dale Drive residence on March 1, 2017, F.S. told her

friend, Nicole Sterling, and Sterling's boyfriend, Cody Massie, about what had happened with defendant. Sterling and Massie called Carlock into the room, and F.S. also disclosed what had happened with defendant to him. Carlock then confronted defendant, who was also at the residence, and asked him if what F.S. reported was true. According to F.S., defendant said that it was true "and that it was his fantasy[,] and he didn't think it was wrong." Ultimately, defendant left the residence, and F.S. reported what had occurred to the police.

¶ 13 On cross-examination, F.S. testified she did not remember the exact date of the first incident when defendant entered her bedroom. Further, she stated that she had previously been "a victim" when she was eight years old and the perpetrator was not defendant. She reported that incident to the police and there was an investigation and "a criminal case." F.S. acknowledged that in relation to the current case, she did not confront defendant after the incidents in question, nor did she change the lock on her bedroom door. However, she stated she did tell Carlock that she did not want defendant in the house any longer but "was told that [they] needed [defendant] there to help with the bills."

¶ 14 Massie testified that he was currently an inmate in the Illinois Department of Corrections, having been convicted of felony possession of a controlled substance. He stated he resided at the Dale Drive residence with F.S., F.S.'s children, Carlock, and defendant for a period of two and a half to three months in early 2017, including the month of February. Massie slept on the couch of the residence. He denied ever observing any intimate or flirtatious contact between F.S. and defendant.

¶ 15 According to Massie, in March 2017, F.S. "broke down" and told him and Sterling that defendant was "taking advantage of her and doing thing[s] to her." He stated F.S. was "crying

hysterically" and, until she calmed down, "was very hard to understand." Massie testified Carlock was at work when F.S. first disclosed what had happened. When Carlock returned home, he and Sterling convinced F.S. to tell him what had happened. Massie recalled that they confronted defendant, who said that the sexual activity between himself and F.S. was consensual and "not wrong."

¶ 16 On cross-examination, Massie testified he was aware that F.S. took medication at night before going to bed. He denied that she ever appeared to be "under the influence of any kind of drug." On redirect examination, Massie testified that taking medications before bed was F.S.'s "routine" and everyone in the house was aware of it.

¶ 17 Carlock testified and recalled living at the Dale Drive residence in 2016 and 2017. He denied ever observing any interactions between defendant and F.S. that caused him concern. Around March 1, 2017, he was lying in bed when Sterling asked him to "come out to the front room" and F.S. began telling him "what was going on and what was happening." Carlock stated that while she was talking, F.S. was "bawling." Afterwards, Carlock called defendant to the kitchen and asked him if what F.S. had told him was true. According to Carlock, defendant stated, "[Y]es, it was his fantasy, and it was okay." Carlock denied that defendant asserted his sexual contact with F.S. was consensual. Ultimately, defendant left the residence after Carlock threatened to shoot him.

¶ 18 Sterling testified she had known defendant for eight or nine years and had a close relationship with him. In late 2016 and early 2017, she frequented the Dale Drive residence and was friends with the people living there. Sterling denied seeing any type of flirtatious or romantic behavior between F.S. and defendant. She recalled visiting F.S. at the Dale Drive residence on

March 1, 2017. At the time, F.S. seemed scared and she was shaking. Eventually, F.S. reported that something had happened between her and defendant. As she related information to Sterling, F.S. was crying. Sterling testified F.S. next told Carlock what had happened and then they confronted defendant. She stated defendant admitted to her "that he did do it." According to Sterling, defendant stated, " 'I did do it, I don't know why I did it[,] but I did it.' " Thereafter, defendant left the residence, and the police were called.

¶ 19　　　　　On cross-examination, Sterling testified that when visiting the Dale Drive residence, she observed signs that F.S. was under the influence of medication, stating F.S. "just wasn't herself." On redirect examination, Sterling testified she was aware that F.S. took her medication before bed and agreed that it made her "sleepy."

¶ 20　　　　　Jonathan Reifsteck testified he was a deputy for the Champaign County Sheriff's Office. On March 1, 2017, he responded to a call for assistance at the Dale Drive residence. He took a statement from F.S., who appeared upset and was crying, as well as other occupants of the residence. Thereafter, Reifsteck determined it was necessary to speak with defendant and contacted him at his mother's home at approximately 5 a.m. His interaction with defendant was recorded on a body camera he was wearing. The body camera recording was admitted into evidence and played for the jury.

¶ 21　　　　　The recording shows Reifsteck informed defendant that he was not under arrest, he did not have to answer any questions, and he was free to go at any time. He then stated he wanted to get defendant's "side" regarding what occurred with F.S. Defendant indicated he knew individuals at the Dale Drive residence were accusing him of "rape," but he asserted he "would never do that" to F.S. He related that on two occasions in February 2017, F.S. asked him for a back

massage and he agreed. He stated he gave her one massage in the living room and another in the bedroom. Defendant asserted the most recent incident with F.S. involved only a back massage and nothing more. However, after Reifsteck suggested that F.S. may have recorded the incident on her phone, defendant stated he gave F.S. a full body massage in the bedroom. He also stated that F.S. took her shirt off and he lowered her pants. Defendant then admitted that he exposed himself, rubbed his penis on F.S.'s buttocks, and ejaculated on F.S.'s back. Following the incident, F.S. took a bath and asked defendant to wash her back.

¶ 22     Defendant maintained F.S. did not resist the encounter and asserted that she never said "no." He stated she was the one who initiated contact by asking for a back massage but agreed that she did not ask for anything else. Defendant also stated what occurred was "wrong." When Reifsteck asked if defendant believed it was wrong "because maybe [F.S.] didn't want this to happen and you're feeling a little bit guilty about it," defendant responded by saying "yeah." However, he also indicated his conduct was wrong because F.S. was dating his friend. Defendant then agreed that "with the exception of being friends with [Carlock,] [he] didn't think [he was] doing anything wrong" when engaging in sexual conduct with F.S.

¶ 23     Defendant testified on his own behalf that he began living at the Dale Drive residence sometime in 2016. He paid rent and contributed to other expenses. Defendant denied having any sexual contact with F.S. in December 2016 or January 2017. He testified that in January 2017, he did give F.S. a back massage in the living room of the residence. That interaction occurred during the day and at F.S.'s request.

¶ 24     Defendant testified that on February 26, 2017, F.S. repeatedly asked him for another back massage. He kept telling her no, but around 11 p.m., he finally relented and agreed

to give her one. According to defendant, F.S. "immediately took off her shirt and laid down on the couch" in the living room. Defendant stated he asked F.S. if he could lower her pants and she said that he could. The massage then "led into a couple of sexual things." Defendant testified he took out his penis and "applied it to her, not in her." Defendant denied that he forced F.S. to engage in any activity or that he threatened her in any way. He also denied that he had been aware that F.S. had been taking medication.

¶ 25 Defendant recalled being confronted on March 1, 2017, at the Dale Drive residence. He testified he was forced to leave the house by Carlock, who threatened to shoot him. Defendant went to his mother's house and was asleep when Reifsteck arrived at 5 a.m. He denied that he completely understood what Reifsteck was asking him during their conversation, stating it was early in the morning and he just woke up. Defendant did not believe he admitted to committing a crime during that interaction.

¶ 26 On cross-examination, defendant described himself as being 5 feet 9 inches tall and, in early 2017, weighing 210 pounds. At the time of trial, he weighed 245 to 250 pounds. He testified that although F.S. was smaller, it was possible that she could physically overpower him because he had "medical problems."

¶ 27 Further, he agreed that during his February 26 interaction with F.S., his penis made contact with F.S.'s body while she was lying on her stomach. He also agreed that F.S. never did anything, either verbally or physically, to indicate that it was okay for him to touch her with his penis or ejaculate on her body. Defendant denied that any sexual activity occurred in F.S.'s bedroom or that he ever went with her to the bathroom. However, after being reminded about his statement to Reifsteck, he asserted that, at F.S.'s request, he went to the bathroom with her after

the February 26 incident to wash her back. Further, defendant clarified that he did know F.S. was taking medication while he lived at the Dale Drive residence, but he did not know when she stopped taking her medication and never saw it have an effect on her.

¶ 28　　　　Additionally, defendant testified he understood what was going on when he spoke with Reifsteck and "knew what [Reifsteck] wanted to talk about." He stated he was a high school graduate, attended Parkland college for two years, "successfully completed a certification as a[n] auto mechanic," and thereafter maintained employment.

¶ 29　　　　As part of his case, defendant also presented testimony from his sister, Jennifer Foss. Jennifer testified she was nine years older than defendant. She observed defendant to have difficulty staying focused on a particular task and stated that when communicating with him she typically had to ask follow-up questions "to get clarification."

¶ 30　　　　Ultimately, the jury found defendant guilty of both charged offenses. Defendant filed a motion for a new trial, challenging various rulings by the trial court. In November 2018, the court denied defendant's posttrial motion and sentenced him to consecutive terms of nine years in prison for criminal sexual assault and one year in prison for criminal sexual abuse. The same month, defendant filed a motion to reduce his sentence, which the court also denied.

¶ 31　　　　This appeal followed.

¶ 32　　　　　　　　　　　　　II. ANALYSIS

¶ 33　　　　On appeal, defendant challenges the sufficiency of the evidence against him. He notes his admission to only consensual sexual contact with F.S. and asserts the State failed to show his conduct involved either force or the threat of force, a necessary element of both charged offenses.

¶ 34    "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64, 162 N.E.3d 223. "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts," and "[t]he reviewing court does not retry the defendant." *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 35    Here, defendant was charged with, and convicted of, one count of criminal sexual assault and one count of criminal sexual abuse. "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** uses force or threat of force." 720 ILCS 5/11-1.20(a)(1) (West 2016). The Criminal Code of 2012 (Code) defines "sexual penetration" as "any contact, however slight, between the sex organ *** of one person and *** the sex organ *** of another person[.]" *Id.* § 11-0.1. Additionally, "[a] person commits criminal sexual abuse if that person *** commits an act of sexual conduct by the use of force or threat of force." *Id.* § 11-1.50(a)(1). Under the Code, "sexual conduct" includes "any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. The Code further defines what constitutes "force or the threat of force," providing as follows: " 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, but not limited to

- 11 -

\*\*\* when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.*

¶ 36        In this case, the record shows the State presented sufficient evidence to support each element of both charged offenses. F.S. testified and clearly described defendant committing acts of both sexual penetration and sexual conduct against her. She asserted that during the February 26, 2017, encounter with defendant, he touched his penis to her vagina while attempting to vaginally penetrate her and that he ejaculated, transferring his semen onto her back.

¶ 37        The evidence at trial also sufficiently established that the sexual acts F.S. described were accomplished through the use of force, in that defendant physically restrained F.S. and overpowered her by using his superior size and strength. Specifically, F.S. testified she awoke to find defendant sitting on top of her buttocks and legs and "holding" her with one of his hands placed on her back and in the area of her shoulders. She stated she tried to move but could not because defendant was "holding [her] down" and "applying pressure" with the hand he had placed on her back. The evidence further showed that defendant is a much larger person than F.S. and that he outweighed her by more than 100 pounds.

¶ 38        On appeal, defendant argues he only engaged in consensual sexual conduct with F.S. and her testimony that she was overcome or forced by defendant was not credible. He contends F.S.'s credibility was diminished by her use of medication that "severely impacted her memory," her inability to recall the specific dates he allegedly assaulted her, and her failure to immediately report the alleged assaults. We disagree.

¶ 39        Initially, although F.S. acknowledged taking medication before bed that "knocked her out" and affected her physical abilities, the evidence presented falls far short of supporting

defendant's claim that her memory was "severely impacted." When specifically asked by the prosecutor whether her medications prevented her from remembering what happened, F.S. stated only: "Pieces and parts I remember." At trial, she otherwise clearly and consistently testified as to the alleged events. We note defendant does not dispute that the specific sexual acts alleged by F.S. to have occurred on February 26, 2017, actually happened. Rather, he claims only that they were consensual and initiated by F.S.'s requests for a massage. Further, while F.S. could not recall the specific date of each alleged assault, she was able to provide specific testimony regarding the events on February 26, 2017, which occurred only several days before she reported the assaults to the police.

¶ 40　　　　Additionally, F.S. provided multiple reasons for her delay in reporting the assaults. She first testified that she was scared no one would believe her, indicating she had been a victim of sexual abuse as a child and had not been believed. Contrary to defendant's contention on appeal, F.S.'s testimony is not necessarily contradicted by testimony that her prior allegations were investigated and involved "a criminal case." F.S. was not asked to clarify who she felt did not believe her reports of abuse and the record is silent as to the outcome of the referenced "criminal case." In explaining her delay in reporting, F.S. also noted the financial assistance defendant was providing to the household and indicated embarrassment over what had occurred. A rational trier of fact could have accepted F.S.'s testimony as true and found it logically supported her failure to immediately report defendant's conduct.

¶ 41　　　　Finally, we note that on appeal, defendant argues his case is analogous to, and controlled by, the First District's decision in *People v. Herman*, 407 Ill. App. 3d 688, 945 N.E.2d 54 (2011). There, the appellate court reversed the defendant's convictions for multiple offenses,

including criminal sexual assault, based largely upon the finding that the alleged victim in the case was not credible and that her testimony was significantly flawed. *Id.* at 709. In reaching its decision, the court noted that the complaining witness was "an admitted crack addict," who was " 'high' during the entire night of the [alleged sexual] encounter" and whose testimony "was fraught with inconsistencies and contradictions." *Id.* at 705. Further, not only did the court conclude "the flaws [in the complaining witness's] testimony made it impossible for any fact finder reasonably to accept any part of it," it also characterized the defendant's testimony as being "internally consistent, unimpeached[,] and unrebutted." *Id.* at 707-09.

¶ 42        We find *Herman* is clearly distinguishable from the facts of the present case. Most notably, F.S.'s testimony in this case was not "fraught" with inconsistencies or contradictions. Rather, F.S.'s version of events was contradicted only by defendant, whose own testimony was, at times, internally inconsistent and contradicted by his prior statement to the police. Under the circumstances presented, we find the State presented sufficient evidence to establish defendant's guilt of the charged offenses beyond a reasonable doubt and *Herman* does not require a different result.

¶ 43                                III. CONCLUSION

¶ 44        For the reasons stated, we affirm the trial court's judgment.

¶ 45        Affirmed.