2023 IL App (1st) 181285

No. 1-18-1285

SIXTH DIVISION
April 7, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No.  17 CR 14937 |
| | ) | |
| DEMARKO WILLIAMS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    This case turns on an ambiguity in the terms of the Cook County Sheriff's Department's pretrial electronic home monitoring ("EHM") detention program as it relates to detainees who reside in multi-unit buildings.  The term "residence" is not defined (at least in the present record) and it's not clear whether residence means one's apartment, or also includes other spaces within

one's apartment building itself. This is surprising, given the large number of detainees on EHM who we presume live in apartments and whose activities of daily living, such as retrieving mail and doing laundry, necessitate regular access to other parts of their apartment buildings. Because of this ambiguity, we hold that the defendant could not have knowingly committed the offense of escape and, therefore, reverse his conviction.

¶ 2     Demarko Williams was convicted of escape for failing to comply with a condition of his EHM and sentenced to an extended term sentence of ten years' imprisonment. On appeal, Williams argues that the State failed to prove him guilty beyond a reasonable doubt; the prosecutor committed reversible error when he gave a portion of his rebuttal closing argument from the witness stand; the trial court erred when it denied his motion *in limine* to introduce evidence that he was acquitted of the charge of delivery of a controlled substance, which was the reason he was on EHM; and his sentence was excessive.

¶ 3                                    BACKGROUND

¶ 4     Prior to trial, Williams moved *in limine* to introduce evidence that he was acquitted of the charge of delivery of a controlled substance, which was the reason he was on EHM. The trial court denied Williams's request finding it to be irrelevant because it had nothing to do with the facts or circumstances of the charge of escape in this case.

¶ 5     At trial, the evidence established that on September 4, 2017, Assistant State's Attorney Patricia Pantoja was working Williams's bond hearing. Williams's bond was set at $75,000 I with EHM as a condition of bond and the next court date was set for September 28, 2017.

¶ 6     Cook County Sheriff's Investigator Wilford Ferguson testified that he was assigned to the Electronic Monitoring Unit of the Cook County Sheriff's Department. Investigator Ferguson

explained when a detainee is placed on EHM, they receive a home monitoring receiving unit, which is an electronic device that allows the sheriff to monitor the detainee. An external monitor transmitter band is then placed on the detainee's ankle. The box is placed in the detainee's home and a signal is transmitted from the band on the detainee's ankle to the box indicating where the detainee is located.

¶ 7    On September 4, 2017, Investigator Ferguson placed Williams on EHM for delivery of a controlled substance charge. Investigator Ferguson went over the terms of the Cook County Sheriff's monitoring participant responsibility agreement and the Cook County Sheriff's office participant contract with Williams, and Williams initialed each term on the agreement and contract and signed both documents. Williams told Investigator Ferguson that he would be living at 1807 East 78th Street, Apt. 1F, while on EHM. He gave Investigator Ferguson a phone number of (773) 801-XXXX. Williams acknowledged by initialing the agreement that he would remain within the interior premises of the residence 24 hours per day unless sheriff's office personnel had granted prior approval of an absence. Williams further acknowledged that he understood that a violation of the EHM detention program conditions may result in a warrant being issued for his arrest for the crime of escape. Williams also acknowledged that when he was granted permission to move to a specific location, he was only permitted to travel to and from that location and that any other stops would be considered a violation of the program. Williams acknowledged that he was to obtain approval from the Sheriff's Office prior to changing his address. Williams never indicated he did not understand any of the terms of the contract.

¶ 8    On September 7, 2017, Cook County Sheriff's Investigator Dexter Keith went to the first-floor apartment at 1807 East 78th Street in Chicago to look for Williams due to a report that was

received that the band had been tampered with or there was an equipment malfunction. Investigator Keith, and his partner Investigator Nichols, were both equipped with a body-worn camera that they activated when they got to the location. When they arrived at 1807 East 78th Street, Apartment 1F, they were unable to locate Williams. An unknown female in the apartment yelled Williams's name out of the back door that led to the back porch. Williams did not respond or appear.

¶ 9 Investigator Keith had a device that showed that Williams's electronic monitoring band was in the area. He explained that the device picked up the "XMT, which is the band. So if that band is intact where it is being monitored by the box, it will be picked up. If you cut that band, no matter where you cut it, it'll still pick up the band." Investigator Keith eventually admitted that his body-worn camera captured him saying that the device indicated that Williams was "in the building." Investigator Keith testified that he and his partner were in the apartment for about 25-30 minutes and Williams was not located. However, neither he nor or his partner searched the building's common areas or spoke to any of the neighbors in the other apartment units to see if Williams was present in the building. Nor did Investigator Keith look for the ankle band. Investigator Keith notified his sergeant that Williams had not been located. Investigator Keith then removed the monitoring box from Williams's apartment.

¶ 10 On October 2, 2017, Chicago police officer Wood responded to a call that led him to the area of 11232 South Michigan Avenue in Chicago. Officer Wood found Williams there and took him into custody. Williams was not wearing an electronic monitoring band.

¶ 11 The State rested. Williams's motion for a directed verdict was denied.

¶ 12 Williams testified that in 2009 he pled guilty to the charge of unlawful use of a weapon

by a felon. Turning to the present case, Williams testified that he received EHM as a condition of his bond on September 4, 2017. Williams stated that someone explained to him what EHM meant when he was in the jail bullpen with 20 to 30 other people. He was told that to go on house arrest he had to initial and sign a form. The form included the rules and regulations of EHM. Williams indicated that we would be living at 1807 East 78th Street with his aunt, Debbie Williams. He was dropped off at that location the next morning by a sheriff's investigator.

¶ 13    Williams testified that the building at 1807 East 78th Street has twelve apartment units with an enclosed back porch. When he was dropped off, the sheriff's investigator told him not to leave the interior of the apartment building and "do not go outside." According to Williams, he was never told he had to stay in his first-floor apartment. Williams thought he would be in compliance with the terms of his EHM so long as he did not leave the apartment building without permission.

¶ 14    Williams was living with his aunt in the first-floor apartment, a two-bedroom, one-bathroom dwelling.  Williams's sister lived on the third floor and a cousin lived across the hall from his aunt. Williams's sister's apartment was accessible from a stairwell on the enclosed back porch.

¶ 15    Williams testified that on September 7, 2017, he went to the third floor to use the bathroom and take a shower in his sister's apartment because his cousin was in the bathroom in his aunt's apartment.  No one else was in his sister's apartment at the time.  After he took a shower, Williams came back downstairs to his aunt's apartment. Williams was informed by his aunt that sheriffs had been there to fix his box. His aunt told him that that if he turned himself in a warrant would not be issued for his arrest. Williams noticed that the electronic monitoring box

was missing and thought the sheriffs took the box to let him know "that [his] service was no longer needed." Williams testified that he called the electronic monitoring call-in center and was placed on hold for numerous hours. No one ever came back to the phone, so he ended the phone call. He never called the center and did not turn himself in.

¶ 16    On cross-examination, Williams acknowledged that he placed his initials next to each term on the electronic monitoring participant responsibility agreement, and he signed the form at the bottom. Williams testified the agreement listed the address 1807 East 78th Street, 1F, Chicago, which is where he was to reside. Williams claimed that Investigator Ferguson did not go over either form with him and he did not review either form or receive a copy. Williams acknowledged that he understood that he could not leave the interior of the building without permission of the Sheriff's office. Williams stated he knew he had court on September 28, 2017, but he did not appear in court on that date and testified that he knew that he was still subject to the terms of EHM on September 28, 2017.

¶ 17    Williams admitted that on October 2, 2017, he left the address of 1807 East 78th Street and was arrested around 112th Street and Michigan Avenue. He did not have the electronic monitoring band when he was arrested. Williams stated that he cut the ankle band off with scissors a couple of weeks after the sheriffs took the monitoring box. Williams further stated that he was aware that if he did not turn himself in after the sheriff's office took his electronic monitoring box, a warrant would be issued for his arrest.

¶ 18    The jury found Williams guilty of escape, and Williams's motion for a new trial was denied. Williams was sentenced to an extended term of 10 years' imprisonment based on his history of violence and criminality. This appeal followed.

¶ 19                                    ANALYSIS

¶ 20    Williams first argues that the State failed to prove him guilty of escape beyond a reasonable doubt.  Specifically, Williams claims that the State did not prove that he knowingly violated the terms of his EHM due to his mistaken belief regarding the definition of interior premises or residence, nor was he consciously aware that leaving his apartment unit would be a violation of his EHM terms and conditions.  We agree.

¶ 21    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999).  We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt.  *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regards to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).  Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 22    EHM detention programs are governed by the Electronic Home Detention Law (730 ILCS 5/5-8A-1 *et seq*. (West 2016)), in the Unified Code of Corrections (Code). The supervising authority, which specifically includes the sheriff, may develop reasonable guidelines for the operation of its EHM detention program. 730 ILCS 5/5-8A-4 (West 2016). Section 5-8A-4

provides, *inter alia*, that participants "shall remain within the interior premises or within the property boundaries of his or her residence at all times during the hours designated by the supervising authority" and then lists a number of "approved absences." 730 ILCS 5/5–8A–4(A), (B) (West 2016).

¶ 23    A person who violates the terms of his EHM may be charged with escape. 730 ILCS 5/5-8A-4.1 (West 2016).   The offense of escape is defined as:

> "A person charged with a felony, or charged with an act which, if committed by an adult, would constitute a felony, conditionally released from the supervising authority through an electronic monitoring or home detention program, who knowingly escapes or leaves from the geographic boundaries of an electronic monitoring or home detention program with the intent to evade prosecution is guilty of a Class 3 felony." 730 ILCS 5/5-8A-4.1(a) (West 2016).

¶ 24    In this case, Williams was charged with violating section 5-8A-4.1(a). The indictment alleged that on September 7, 2017, Williams committed the offense of escape in that he was charged with  delivery of a controlled substance; was conditionally released by the Cook County Sheriff on the EHM detention program; and knowingly violated a term or condition of the EHM detention program by being absent without leave from his assigned location. 730 ILCS 5/5-8A-4.1(a) (West 2016).  A person knows, or acts knowingly or with knowledge of:

> "(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct."  720 ILCS 5/4-5 (West 2010).

¶ 25    Here, the State did not prove that Williams knowingly violated a term or condition of the Cook County Sheriff's Department's EHM detention program by being absent from his apartment unit.  At trial, the State offered two documents into evidence proving the terms of Williams's EHM.  The first was a "Monitoring Participant Responsibility Agreement" between Williams and 3M Electronic Monitoring, Inc., a Delaware corporation (3M), that listed Williams's address as 1807 East 78th Street #1F, Chicago.  This agreement outlined Williams's obligations with respect to the equipment used in electronic monitoring, and states that Williams grants 3M access to the EHM equipment at his "residence" at any time.  The second document was entitled "Cook County Sheriff's Office Participant Contract," and is signed by Williams and witnessed by a sheriff's investigator.  This document includes Williams's name and jail number, but his address or residence is not stated anywhere.  The introductory paragraph of this document states that, "By affixing your initials to each program condition and your signature at the end of this contract, you do hereby agree to the fact that you fully understand this contract and agree to the conditions set forth herein." Williams initialed each proposition listed and signed on the participant's signature line.

¶ 26    Williams initialed the proposition indicating that he agreed "to remain within the interior premises of [his] residence twenty-four hours per day unless Sheriff's Office Personnel have granted prior approval of an absence."  Williams also initialed the proposition that he agreed "to admit representatives of this program into your residence twenty-four hours per day to ensure

compliance with the conditions of this program." Finally, Williams initialed the proposition that he agreed "to obtain approval from the Sheriff's office prior to changing [his] address or scheduling movement outside of your residence." Neither the terms "residence" nor "interior premises of your residence" is defined on either of the forms admitted into evidence and there are no specific instructions for participants who reside in multi-unit buildings.

¶ 27    Williams also initialed the propositions that he received "a detailed copy of the rules and regulations of Electronic Monitoring and agree[d] to follow and abide by them," and that he had "viewed the Electronic Monitoring new release participant video." Notably, neither the rules and regulations nor the participant video were introduced into evidence.

¶ 28    Our review of the trial record reveals that the State failed to offer any evidence that the terms of Williams's EHM required that he remain within his apartment unit and that he was not permitted to go to other places within his apartment building without the Sheriff's approval. Rather, Investigator Ferguson merely testified that he went over the terms and conditions in the documents Williams signed. Again, there is nothing in those documents that address where one may go within a multi-unit building without the Sheriff's approval. Investigator Ferguson's carefully chosen words expose the fatal flaw in the State's case.

¶ 29    Moreover, the State did not offer any evidence to refute Williams's testimony that when he was returned home the sheriff's investigator told him that he had to stay within the building. Further, on September 7, 2017, when sheriff deputies went to the address that Williams listed on the contract to check on the equipment, Williams was not present, although according to Investigator Keith his band was within range and, therefore, Williams was "in the building." Williams testified at trial that he was in the building when the deputies arrived but was in his

sister's apartment on the third floor taking a shower. Again, the State failed to offer any evidence to rebut Williams's testimony that he was inside the apartment building at 1807 East 78th Street, where he resided.

¶ 30    We further observe that the ambiguity in the terms of Williams's EHM agreement appeared to stymie the jury's deliberations as well. Before the jury returned its verdict, it sent two notes to the court. The first note asked, "Is the primary violation that the defendant knowingly violated the terms of the [EHM] *by not being in the unit* when the officers arrived." (emphasis added). The jury was told it had heard the evidence and received the law, and to continue deliberating. Afterwards, the jury sent a second note asking, "what if we are at an impasse?" At that point, the court issue a *Prim* instruction over Williams's objection. Although the jury returned a verdict of guilty, the jury's questions indicate to us that, based on the evidence offered by the State, the jury had difficulty understanding whether the terms of Williams's EHM required him to remain in his apartment or whether he was permitted to leave his apartment unit so long as he stayed with his apartment building. The jury's apparent confusion was entirely understandable. Multi-unit buildings often have laundry facilities located outside one's unit, such as a basement. Moreover, mailboxes for multi-unit buildings are typically located in a vestibule or lobby. Likewise, packages are often left in a vestibule of a multi-unit building. Utility and storage rooms are also often located in the basement of a multi-unit building. Thus, one can only remain within the confines of an apartment so long before having to leave the unit to attend to the activities of daily living. Inexplicably, there is nothing in this record that would have informed Williams that the terms of his EHM prohibited him from going to other parts of his apartment building without the Sheriff's prior approval.

¶ 31   The State makes much of the fact that Williams acknowledged the terms of his EHM did not permit him to leave his "assigned location" without the Sheriff's approval.  The State's introduction of the new phrase, "assigned location," is no more helpful than the ambiguous language in the two contracts admitted as evidence.  More pertinently, however, the State's argument implicates section 5-8A-4 of the Code of Corrections, which provides that instances of approved absences shall include going to work, seeking employment, seeking medical treatment, attending school, attending religious services, participating in community work release programs, purchasing groceries and other necessities, and other compelling reasons consistent with the public interest. 730 ILCS 5/5-8A-4 (West 2016).  The common thread in these instances of approved absences is the detainee leaves the building in which he resides, be it a single family or multi-unit building.  There is no provision requiring approval for moving about within the confines of a multi-unit building, suggesting the legislature did not contemplate that such movement could form the basis of the offense of escape under an EHM detention program.  In that regard, we note that Officer Keith agreed that a mechanical problem with a box or a strap tamper could occur when an EHM participant was "on the property" but "out of range of the box," like "in a common area or a porch or something like that."  He further agreed that when an EHM participant was on the property but out of the range of the box that sheriff's officers had the discretion to decide whether to arrest the EHM participant because sometimes people make "mistakes and you can explain it to them that, hey, you are not supposed to do this."  We would go a step further and say that when the rules are not clear, a "mistake" does not amount to criminality.

¶ 32   Finally, the State argues that Williams's failure to appear in court on September 28, 2017,

and admission that he cut off his ankle band demonstrate his consciousness of guilt that he knowingly violated the terms of his EHM. To be clear, the State's theory of the case was that Williams committed the offense of escape by absenting himself from his apartment on September 7, 2017, and the State did not predicate its prosecution on any offense that he may have committed after September 7, 2017. As to Williams' consciousness of guilt, we find that irrelevant where the Cook County Sheriff's Department's terms and conditions for its EHM detention program fail to include any restrictions on movement within a multi-unit building.

¶ 33　The ambiguity in the terms of the EHM detention program and Investigator Keith's admission that Williams was in the building, coupled with the fact that Williams testified he was unaware that he needed to remain in his apartment unit, and the fact that none of the State's witnesses or exhibits established that Williams was informed, either verbally or by written instruction, that he must remain in his apartment unit, rather than his apartment building, negates the knowledge element required to prove escape. Viewing the evidence in the light most favorable to the State, we hold that the evidence was insufficient to prove Williams guilty of escape beyond a reasonable doubt. Therefore, we reverse Williams's conviction.

¶ 34　Although our finding that the State failed to prove Williams guilty of escape makes it unnecessary to address Williams's remaining arguments on appeal, we are compelled to comment on a particularly troubling aspect of this case. Williams contends that the State violated his right to a fair and impartial trial because the prosecutor started his rebuttal argument by sitting in the witness stand and compared Williams's credibility with that of the State's witnesses. That portion of argument reads as follows:

　　　　"Most of the testimony you heard and most of the evidence in this case came from

this witness stand, okay. And the judge is going to explain to you that you are supposed to consider every witness based on their circumstances, what they are thinking about, judge each one independently regardless of where they're employed or anything like that.

So you heard from the Sheriff's officers, the State's Attorney, and you heard from the defendant. The defendant is in a different position. He is charged with this crime. He is up there under that circumstance where he is looking at this case and whether or not he is going to be found guilty when he is testifying. So you can think about that.

The other thing is when he is sitting here, you also heard that he is a convicted felon. He has an unlawful use of a weapon felony charge from 2009. That can be considered. And the judge is going to tell you about that instruction, about how that can be considered about your credibility. If you are a felon, you might not be as credible as somebody who has no criminal history, okay.

You also heard then from the sheriffs. And they have got no bias. They are doing their job. They do this for everybody."

¶ 35    In *People v. Mpulamasaka*, 2016 IL App (2d) 130703, we found that the prosecutor engaged in misconduct by, among other objectionable conduct, sitting in the witness chair to argue that the alleged victim was courageous while also discussing the defendant's credibility. *Id.* ¶¶ 107-13. We stated:

"[D]efense counsel said in his opening statement that defendant would testify. Defendant later decided that he would not testify. Whether intentionally or not, by arguing [the alleged victim's] courage and then transitioning to defendant's credibility, the prosecutor might have reminded the jury that defendant did not testify, especially when the argument

14

was made from the witness chair. Indeed, the most troubling aspect of the prosecutor's conduct was leaving the podium and sitting in the witness chair to argue the victim's credibility and courage and then discussing defendant's credibility. There is no question that this tactic was designed to evoke sympathy for [the alleged victim] and disgust for defendant." *Id*. ¶ 113.

¶ 36 In *Mpulamasaka*, we also faulted the trial judge for failing to *sua sponte* remove the prosecutor from the witness stand. "It is the trial court's duty to maintain order in the courtroom." *People v. Dixon*, 36 Ill. App. 3d 247, 253 (1976). "The trial judge must take steps to avoid the appearance that he or she is partial to the State or to the defense. Even absent an objection from the defense, the trial court here should not have allowed the prosecutor to argue from the witness stand." *Mpulamasaka*, 2016 IL App (2d) 130703 ¶ 116.

¶ 37 The witness chair, as the name implies, is where a witness sits and gives evidence under oath to the fact finder. It is, indeed, the proverbial main stage of a trial. The only reason we can discern for a prosecutor (or any trial counsel for that matter) to deliver a closing argument discussing witness credibility from the witness chair is to attempt to cloak his words with the imprimatur of truth. We were troubled enough by this in *Mpulamasaka* that we went so far as to instruct our trial judges to immediately evict a prosecutor from the witness stand, even if the defendant, as here, does not object.

¶ 38 We are concerned not only with justice, but the perception of justice. Here, the prosecutor's conduct (and the trial court's failure to intervene) created a perception that favored the State's case. We, once again, instruct trial counsel and trial judges that the witness chair is reserved for witnesses to give evidence, not for trial counsel to deliver argument, and any

attempt to infringe on the witness chair by trial counsel should immediately be met with a roadblock from the trial court. We may not countenance conduct that creates the perception that our justice system is not even-handed.

¶ 39                              CONCLUSION

¶ 40    For the foregoing reasons, the judgment of the circuit court is reversed.

***People v. Williams*, 2023 IL App (1st) 181285**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17 CR 14937; the Honorable James B. Linn, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Matthew M. Daniels, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Sarah L. Simpson, and Angel Eggleston, Assistant State's Attorneys, of counsel), for the People. |