NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230410-U

NO. 4-23-0410

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cass County |
| KEVIN L. OWNBEY, | ) | No. 19CF91 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Wessel, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding (1) the evidence was sufficient to convict
defendant beyond a reasonable doubt and (2) defendant forfeited his argument his
convictions of two counts of aggravated domestic battery violated the one-act,
one-crime doctrine and, in any event, the doctrine did not apply.

¶ 2    On March 9, 2023, a jury found defendant, Kevin L. Ownbey, guilty of two

counts of aggravated domestic battery (720 ILCS 5/12-3.3(a), (a-5) (West 2018)), in connection

with the beating of Amy Gotschall (Amy).  Count one alleged defendant, in committing a

domestic battery, caused great bodily harm.  Count two alleged defendant, in committing a

domestic battery, strangled Amy.

¶ 3    On appeal, defendant contends the State failed to prove him guilty beyond a

reasonable doubt based on inconsistencies in the testimony of the State's witnesses and evidence

a different man, Michael Brooks, actually battered Amy. Defendant also asserts one of his convictions must be vacated under the one-act, one-crime doctrine. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         On October 16, 2019, the State charged defendant with two counts of aggravated domestic battery (720 ILCS 5/12-3.3(a), (a-5) (West 2018)), three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1), (2) (West 2018)), and two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1), (4) (West 2018)), in connection with the battery and alleged sexual assault of Amy, which occurred between October 7 and 9, 2019. On March 6, 2023, a jury trial was held.

¶ 6         Evidence at trial showed Amy had cerebral palsy, causing right-side paralysis. She previously received structural special education, including five years at an academy for the neurologically handicapped. Her social history had been centered around special education students. At the time of the battery, Amy lived with defendant on South Clay Street in Ashland, Illinois. Also residing at the house were Amy's mother, Joyce Gotschall-Swain (Joyce), defendant's daughter, Tabitha Ownbey (Tabitha), and Tabitha's two children. At the time of the trial, Amy was 51 years of age.

¶ 7         Witnesses at the trial testified about a previous incident between defendant and Amy, occurring on September 24, 2019. On that date, at about 5 a.m., Amy banged on the door of a neighbor, Marissa Johnson. Johnson testified Amy was "absolutely terrified, yelling that she needed to come in." Amy told Johnson defendant was beating and hurting her, and Johnson observed a mark on Amy's arm and eye. Johnson called 911.

¶ 8         Larry Cave testified he was working as an Ashland, Illinois, patrol officer on September 24, 2019, and responded to the call on South Clay Street about a possible domestic

disturbance. As part of that call, Cave stopped defendant, who had driven away from the area. Defendant showed Cave videos on his phone of a verbal argument. Cave testified defendant told him "she may have some bruising, but he did not do it."

¶ 9 James Birdsell testified he was employed as the chief of the Ashland Police Department at the time and investigated the September 24, 2019, call. Birdsell observed marks on Amy's face and foot, and Amy identified defendant as the person who caused the marks. After Birdsell completed his investigation, he arrested defendant for domestic battery. Defendant told Birdsell he did not do anything to Amy and said she caused the marks herself. Photos of Amy's injuries were shown to the jury.

¶ 10 The record shows defendant was under a no-contact order pertaining to Amy after September 24, 2019, until he appeared in court on October 7, 2019. The trial court also admitted an exhibit as propensity evidence under section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2022)), which showed defendant was previously convicted in Kankakee County of aggravated battery causing great bodily harm for an offense that occurred on September 30, 2019, and of domestic battery for an offense in July 2010. That evidentiary ruling is not at issue on appeal.

¶ 11 Birdsell testified he was again called to investigate a disturbance between defendant and Amy on October 8, 2019, at around 5:30 a.m. When Birdsell arrived, Tabitha met him outside and said she was mad at defendant. Birdsell did not see Joyce at the scene. Birdsell knocked on the door, and Lance LaRusso, defendant's nephew, answered. LaRusso initially said defendant and Amy were not there but, after Birdsell said he knew they were inside, defendant came out of a bedroom. Defendant said Amy was okay and there was nothing wrong. Birdsell observed Amy lying on the bedroom floor, covered in a blanket. Amy had bruising on her face,

and Birdsell testified she "seemed like she was out of it, maybe under the influence of something." Amy told Birdsell she was okay. Defendant was present while Birdsell spoke with Amy.

¶ 12 Birdsell called emergency services, who came to the scene, and Amy refused treatment. Meanwhile, defendant told Birdsell he had been gone and, while he was gone, his ex-wife, Samantha Gionnone (Samantha), and Tabitha had been "pimping Amy out," and Amy had gotten beaten up by "some guy from Missouri that she met in Springfield[, Illinois]." Defendant did not mention anything about a sexual assault. Birdsell told defendant he could make an initial report, but defendant would have to follow up with the Springfield Police Department. Birdsell then left. He did not take any photos of Amy's injuries.

¶ 13 On October 9, 2019, at around 11 a.m., Terry Comiskey, the chief deputy with the Cass County Sheriff's Office, went to the house on South Clay Street in response to a call for a welfare check made by Amy's father and Joyce's ex-husband, Harold Gottschall. Defendant allowed Comiskey to come inside. Comiskey observed Amy sleeping on a couch, covered with blanket, and he could see bruising on her face. Defendant said Amy had been battered by a person in Springfield. Comiskey asked if it had been reported to the Springfield police, and defendant said no, but he planned to report it. During the time Comiskey was at the house, Joyce was present and did not accuse defendant of abusing Amy. Comiskey did not speak with Amy because defendant said he thought it was best to let Amy rest. Comiskey later learned Amy was taken to a hospital in Springfield, and Comiskey called Officer Michael Gamble of the Springfield Police Department as a courtesy call to tell him about the situation.

¶ 14 Also on October 9, 2019, Birdsell received phone calls that led him to go to a hospital in Springfield and speak to Springfield detectives. Amy had been admitted to the

hospital there, and defendant had been arrested. Birdsell was given the name Michael Brooks as the person who allegedly beat Amy in Springfield and was told Brooks worked at Cracker Barrel. Birdsell went to Cracker Barrel and spoke to a manager, who said Brooks never worked there. On cross-examination, Birdsell stated he did not speak to LaRusso or Joyce about Brooks at that time but indicated the police in Springfield talked to them. He did not ask Amy about Brooks and did not know what efforts others made to try to locate Brooks. He also admitted he did not return to the house in Ashland to attempt to look for blood, recover physical evidence, or take photographs. He also did not take photos of defendant's hands and did not know if DNA connected defendant to any of the allegations.

¶ 15        Officer Michael Gamble testified defendant, Joyce, and LaRusso came to the police department and told him Amy had been taken to the hospital because she had been in an altercation, possibly involving her pimp, in the Springfield area. Gamble believed defendant said the perpetrator's name was Michael Brooks. Defendant said Tabitha and Samantha introduced Amy to Brooks behind his back two year's prior without his knowledge. Defendant said he learned of the situation about two weeks earlier. He also stated Brooks possibly worked at Cracker Barrel. Joyce and LaRusso did not contradict defendant's statements, and Joyce gave Gamble information similar to the statements defendant provided. Gamble recorded the conversation on his body camera, which was played for the jury.

¶ 16        Shawn Daubs, a detective with the Springfield Police Department, testified he received a call on October 9, 2019, that Amy had been brought to a hospital in Springfield with life-threatening injuries that might involve some form of human trafficking. Daubs met with defendant, who told him Samantha and Tabitha introduced Amy to Brooks, who grabbed Amy and held her against her will. Defendant stated Brooks had a bondage fetish, tortured Amy, and

sexually assaulted her with "objects." Defendant said within the last month, Brooks wanted defendant out of the house on South Clay Street and designed a plan to batter Amy, send her to the house on Clay Street, and then Amy would call the police and state defendant caused the injuries to her. Defendant told Daubs Amy left the house on October 9, 2019, at approximately 3:30 a.m. and returned at 5:30 a.m. with fresh injuries. During the interview, defendant also said he thought it was strange Amy had three cell phones, but "a minute later" gave a reasonable explanation for that, stating one was Amy's, one was a new one after she lost her phone, and one belonged to Joyce. Defendant also stated Amy would not give him the passwords to the phones, but he then said he had gone through messages on the phones. Daubs felt that was inconsistent and believed defendant was trying to make up details during the interview. A video of the interview was admitted into evidence and played for the jury.

¶ 17 Defendant told Daubs he called Cracker Barrel and initially confirmed Brooks worked there, but they later denied it. Defendant showed Daubs a Facebook page for Brooks. That page stated Brooks was moving to Kansas City from San Diego because his wife and son were in Kansas City. Daubs never contacted Brooks.

¶ 18 Daubs went to another room to interview Joyce, who said Amy told her about a person named Michael Brooks. Joyce said she had seen a picture of him, and she believed he looked familiar. Daubs testified he did not show her the Facebook photo. Joyce also told Daubs Amy had told defendant "a lot more" but also stated she did not believe Amy. Joyce also stated "we" gave Amy Seroquel, and Amy did not get her injuries that day. Evidence was not provided specifying what Seroquel is, what it is given for, or its effects.

¶ 19 During Daubs's interview with Joyce, he received a call from Officer Leroy Jett, who was at the hospital with Amy. Daubs then took possession of defendant's cell phone and

informed defendant he was being detained until officers from Ashland could arrive. Defendant chose not to speak further with Daubs. Daubs's interactions with defendant were recorded and played for the jury.

¶ 20 Daubs also interviewed LaRusso and testified the interview had a lot of inconsistencies. That interview, in which LaRusso's speech was at times difficult to understand, was played for the jury and to refresh Daubs's recollection of the interview. The record shows Daubs had a difficult time answering questions about the interview based on the poor quality of the audio. However, Daubs agreed that, during the interview, LaRusso mentioned Brooks torturing Amy and spoke of Tabitha and Samantha "pimping out Amy." During the interview, LaRusso initially refused to implicate defendant and repeatedly said he did not see defendant hit Amy. Daubs accused LaRusso of lying and explained how he understood why LaRusso might want to protect a family member or not accuse them but urged LaRusso to tell the truth. LaRusso eventually told Daubs he saw defendant and Amy argue, saw defendant hit Amy, and saw her fall on the floor. LaRusso tried to break up the fight, and defendant told him to go sit down. He agreed with an officer's assessment the fight between Amy and defendant was one-sided, since Amy would not be able to physically defend herself well.

¶ 21 Officer Leroy Jett testified he responded to the hospital in Springfield on October 9, 2019, to investigate Amy's battery. He observed Amy had swelling, dried blood, and bruising on the side of her face. Michelle Alepra, the emergency room physician who treated Amy, also testified about the extent of her injuries, which included a laceration and hematoma on her spleen, a vertebral fracture, a hyoid bone fracture, and a finger fracture. Amy also had swelling around the ear and face, a ruptured eardrum, and a brain bleed. Alepra opined Amy's injuries constituted great bodily harm. Documentation not made by Alepra generally noted injury or

trauma to Amy's genitalia. However, a notation relating to a sexual assault kit stated it was within normal limits and a document mentioned the rectal area was within limits, which typically meant no obvious abnormalities were observed.

¶ 22         Brittany Brown, a registered nurse, treated Amy at the hospital, performed a sexual assault kit, and identified photos of Amy's injuries. Brown did not document any injuries in Amy's vaginal or rectal areas. The record shows DNA testing did not implicate defendant in any meaningful way to the crimes. An anal swab contained profiles from Amy and at least one other person, but there was no male DNA detected. A vaginal swab also had no male DNA detected. A cheek swab contained a mixture of at least three people, but there was not enough information for Brown to do anything with it. The parties stipulated a lab report showed amphetamine, methamphetamine, benzoylecgonine (cocaine metabolites) and quetiapine (sold under the brand name Seroquel) were detected in Amy's urine.

¶ 23         Samantha testified she did not know a person named Michael Brooks and had never met a person by that name. She did not introduce Amy to a person by that name. She testified she had never brought a man other than her fiancé, sons, or a friend to Cass County, nor suggested that Tabitha do so. She said she the police never contacted her to inquire about a person named Brooks or about her bringing men to meet Amy.

¶ 24         Tabitha testified she never met a person named Michael Brooks and never facilitated Amy meeting any men. She also did not observe either Samantha or Amy bring any men Tabitha did not know to the house. The police never contacted her to inquire about a person named Brooks or about her bringing men to meet Amy. Tabitha testified, on October 8, 2019, defendant sent her a text around 3 a.m., telling her to come pick up her kids and he was "out of

tricks for Amy." Tabitha said it did not make sense, but she went to the house and picked up her children.

¶ 25        Joyce testified she had lived with defendant and Amy for about two years. She said defendant and Amy had fights, and "maybe the month before," they became physical. Joyce testified "right around this time," she saw defendant choking Amy, and she had to peel his fingers away from Amy's neck. When asked to clarify the time she was referring to, Joyce said, "October I think the 8th or 9th, around in there." Joyce said "we" called the police and "she didn't want to do anything and they left." The record is not clear who called the police, as Joyce also testified she did not make the call and defendant had taken her cell phone. Joyce said LaRusso and his girlfriend were also there at the time. Joyce then drove LaRusso and his girlfriend to Kankakee, leaving Amy and defendant at the house for approximately seven hours. When she returned, defendant seemed to have calmed down. Joyce indicated Tabitha was also there with her children, but defendant asked them to leave. During that time, Joyce also called her ex-husband, Harold Gotschall (Harold) "and told him he should come," but as the evening progressed, she decided everything was okay, and she went to sleep. The next day, they went to the Springfield Police Department. In a video exhibit of Joyce speaking to an officer there, Joyce said Amy requested to go to the hospital, and an ambulance was called.

¶ 26        On cross-examination, Joyce testified she did not see defendant beat Amy. She only heard Amy "holler," and that was when she went into the bedroom and saw defendant choking her. Joyce admitted she did not say anything to the police when they came about defendant choking Amy or taking her cell phone. She admitted she told officers she felt safe living at the house. Joyce also said she saw bruises on Amy around October 3, 2019, at a time when defendant was in Kankakee for a few weeks.

¶ 27 Joyce also testified Amy told her in the presence of defendant she had been seeing a married man for about two years who "grabbed her and made her do things." When asked, "[Amy] told you that she met this guy Michael Brooks through [Samantha] and [Tabitha], correct?" Joyce replied that was correct. Amy also told her Brooks had a plan to beat Amy and blame it on defendant. Amy said Brooks told her if she did not do it, he would punch her, and if she did do it, he would reward her. Amy showed her a photo of Brooks from a yearbook from a school in California near San Diego, and Joyce thought he looked familiar. The police never asked Joyce about Brooks.

¶ 28 Harold testified he lived in California. He initially was introduced to defendant as a person with the last name of Smith, and he likened defendant's circumstances to that of a "family of grifters." Harold testified he found defendant intimidating and he was afraid of him, although defendant never harmed Harold.

¶ 29 On October 8, 2019, Joyce called Harold. He testified:

> "She was advising me that Amy needed me to come back and save her, that she
> was somehow involved in prostitution, and during that [defendant's] voice
> repeatedly interrupted the phone call and, of course, we recognized one of them,
> and he was quite loud, vociferous about suggesting I should urgently come back
> and save Amy."

Harold thought Joyce sounded "unusually measured and scripted" during the call, which was not typical for her. During the call, Harold heard defendant repeating what Joyce said. Harold described it as, "he painted a picture of what you see on TV and [was] quite adamant." Harold asked to speak to Amy, who "basically spoke a few words but that was it." Defendant did not

mention the name Michael Brooks but described the situation as involving a pimp. Harold made travel arrangements and arrived at the hospital the night of October 10, 2019.

¶ 30 Amy testified the police came to the South Clay Street residence on September 24, 2019, after defendant punched her and she ran to a neighbor's house. Amy initially went to the courthouse afterward to get an order of protection but then did not do so. She said the September incident was the first time there had been a physical altercation between her and defendant. After the incident, defendant was not allowed to be at the house until he had a court hearing.

¶ 31 On October 7, 2019, defendant appeared in court and then returned to the house. On that day, Amy was playing an online game with Brooks, who was a friend of hers from high school in California. Amy testified defendant then decided she had been cheating on him, grabbed her phone, and started hitting her. She testified defendant also picked her up and dropped her on the floor, causing her to hit her head, burnt her neck and cut her ear with a knife. Amy stated defendant then coerced her into making a video stating Tabitha and Samantha had taken her to a house and a man tortured her there. Defendant told Amy what to say and, if she said a wrong word, he would delete the video and make her redo it. The video was introduced into evidence. In it, Amy stated Brooks beat her. Bruises were visible on her face in the video. On cross-examination, defense counsel pointed out there were no burn marks on Amy's neck in the video. Amy replied she had the dates mixed up, indicating defendant may have burned her on October 8. At other times in her testimony, Amy also appeared to have difficulties remembering which injuries occurred on which date, creating some inconsistencies in her testimony. She admitted during her testimony to having brain damage from before the incident. However, she also stated she had a good memory.

¶ 32        On October 8, 2019, the police came to the house, and Amy told them she was fine. She testified she was in and out of consciousness and barely remembered Birdsell being there. She did not think she needed medical treatment at that time. Amy testified, after Joyce left to drive LaRusso to Kankakee, defendant penetrated her vaginally and rectally with a coat hanger and his penis. He also bit, punched, kicked, and strangled her. Amy was unable to defend herself because she was unable to use her right hand due to her physical limitations. At some point Joyce arrived and pulled defendant's hands off of Amy's neck. When shown photos of her injuries, Amy described several more instances of battery, during which defendant scraped her skin with a dart and hit her with a shower chair leg. Once Amy was safe at the hospital, she told people what defendant had done to her. A video of Amy in the hospital showed severe bruising on her face that was not present in the video she made implicating Brooks.

¶ 33        Amy testified she was unable to call the police because defendant took her phone. She did not recall being given any medication between October 7 and 9, 2019, and said she was not taking any illicit drugs. She had been prescribed Seroquel in the past but could not recall if she was taking it in October 2019. Amy testified she had never been a prostitute, and Tabitha and Samantha never set up any dates for her with random men. She was never threatened or assaulted by Brooks and did not cheat on defendant with Brooks. She also said she never showed Joyce a yearbook photo of Brooks but said she did show her his Facebook page. When questioned on cross-examination as to why she did not ask for help when the police came to the house, Amy said she was too afraid to do so. However, she stated she tried to run away on October 8, but defendant stopped her. Amy said she screamed for help, and Tabitha's children tried to help her, but she told them to go sit down and not watch.

¶ 34    After the close of the State's evidence, the trial court granted defendant's motion for a directed verdict on a count of criminal sexual assault involving sexual penetration while knowing Amy could not give consent. The court denied motions for a directed verdict as to the remaining counts.

¶ 35    The defense recalled Birdsell, who testified Amy never told him about being coerced to make a video but did tell him defendant took photos of the assault with his phone. LaRusso testified he went to the Springfield Police Department with defendant to make a report about Brooks. He said he heard Amy and Tabitha talking about Brooks over a speakerphone on October 8, 2019, but did not specify what was said. He also indicated he heard Amy tell Joyce and defendant she had been seeing Brooks. LaRusso testified about an incident on October 9, 2019, where he saw Amy sitting in a truck screaming and crying, and defendant went outside and got her. LaRusso admitted he told officers defendant beat Amy but said he did so because he was intimidated. He testified he did not see defendant choke, burn, or sexually assault Amy.

¶ 36    Deon Grear, a private investigator, testified he picked up defendant's cell phone from the jail. The phone did not have any photographs or videos of defendant committing a battery or sexual assault. An exhibit of text messages on the phone showed Amy communicated with defendant between September 24 and October 4, 2019.

¶ 37    The jury found defendant guilty of both counts of aggravated domestic battery and not guilty of the sexual assault charges. Defendant moved for a new trial and also noted sentencing issues. Defendant did not seek merger of the convictions under the one-act, one-crime doctrine. The trial court denied defendant's motion for a new trial and sentenced him to consecutive terms of 11 years' incarceration.

¶ 38    This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40         On appeal, defendant contends the State failed to prove him guilty beyond a

reasonable doubt.  He argues Amy's story was uncorroborated and the majority of the evidence

showed Brooks was the person who actually battered her.

¶ 41         A reviewing court will not set aside a criminal conviction unless the evidence is

so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.

*People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276 (1985).  On a challenge to the

sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *Collins*, 106 Ill. 2d

at 261, 478 N.E.2d at 277 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This

standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial

evidence meeting this standard is sufficient to sustain a criminal conviction.  *People v. Jackson*,

232 Ill. 2d 246, 281, 903 N.E.2d 388, 406 (2009).  The determination of the credibility of each

witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the

evidence is within the province of the trier of fact, and a reviewing court will not substitute its

judgment for that of the trier of fact on these matters.  *People v. Brooks*, 187 Ill. 2d 91, 132, 718

N.E.2d 88, 111 (1999).  "Moreover, the testimony of a single witness, if positive and credible, is

sufficient to prove a defendant guilty beyond a reasonable doubt."  *People v. Sturgeon*, 2019 IL

App (4th) 170035, ¶ 62, 126 N.E.3d 703.  Further, minor inconsistencies in the testimony do not,

of themselves, create a reasonable doubt as to a defendant's conviction.  *People v. Bowen*, 241

Ill. App. 3d 608, 620, 609 N.E.2d 346, 357 (1993).

¶ 42    Here, while there were inconsistencies in the testimony of multiple witnesses, Amy directly testified defendant caused her injuries. While defendant suggests the evidence showed Brooks actually battered Amy, the evidence supported the conclusion defendant made up the story about Brooks. Amy testified that the extent of her interactions with Brooks was through playing an online game. She further testified defendant coerced her into making a video implicating Brooks. Samantha and Tabitha directly contradicted defendant's claims about Brooks by testifying they did not introduce Amy to Brooks or "pimp her out" to him. Brooks' Facebook page showed he lived in California and was moving to Kansas City, and Brooks could not be located at the Cracker Barrel where defendant claimed Brooks worked. Indeed, defendant's own story about Amy's beating changed over time, with him initially stating Amy was beaten by a man in connection with prostitution but later stating Brooks beat Amy in order to frame defendant. Thus, contrary to defendant's argument, there was evidence defendant committed the crime, and the evidence did not solely or overwhelmingly implicate Brooks.

¶ 43    Defendant, however, analogizes his case to *People v. Herman*, 407 Ill. App. 3d 688, 945 N.E.2d 54 (2011). There, the defendant, a police officer, was convicted of aggravated criminal sexual assault, criminal sexual assault, kidnaping, and official police misconduct. The victim, a self-described crack-cocaine addict, initially reported the defendant assaulted her around 3:30 a.m. *Herman*, 407 Ill. App. 3d at 705, 945 N.E.2d at 68. Throughout the course of the investigation, the victim related her story to several police officers and medical personnel. However, the victim's timeline of the encounter varied several times, with her stating it occurred anywhere between 3 and 5 a.m. *Herman*, 407 Ill. App. 3d at 705, 945 N.E.2d at 68.

¶ 44    At trial, the defendant's theory was a consensual encounter took place between him and the victim earlier in the evening, prior to his being on duty, and the victim had a motive

- 15 -

to fabricate a rape for money to support her drug addiction. *Herman*, 407 Ill. App. 3d at 689, 945 N.E.2d at 55. The defendant presented evidence of the victim's attempt to extort $5000 from him. *Herman*, 407 Ill. App. 3d at 698, 945 N.E.2d at 62. He also provided uncontradicted evidence verifying his whereabouts from 3 a.m. to 4:50 a.m. and 5:28 a.m. to 5:58 a.m. on the date of the alleged crime. *Herman*, 407 Ill. App. 3d at 705-06, 945 N.E.2d at 68. At trial, the victim changed her timeline, stating for the first time the assault occurred after 5:25 a.m., which coincided with the gap in the evidence. *Herman*, 407 Ill. App. 3d at 706, 945 N.E.2d at 68.

¶ 45    The First District reversed the defendant's convictions. The court first noted the physical evidence "was as consistent with defendant's testimony of a consensual encounter as it was with [the victim's] testimony of force," which meant the prosecution's case "rested almost entirely on the credibility of [the victim]." *Herman*, 407 Ill. App. 3d at 704, 945 N.E.2d at 67. The court found the victim's testimony was "fraught with inconsistencies and contradictions, most notably related to the time line of events related to the encounter." *Herman*, 407 Ill. App. 3d at 705, 945 N.E.2d at 68. In contrast, the court found the defendant's alibi testimony was "internally consistent, unimpeached and unrebutted." *Herman*, 407 Ill. App. 3d at 708-09, 945 N.E.2d at 70. The court recognized it was the province of the fact finder to resolve the inconsistencies but determined the inconsistencies in the victim's story were not "minor" and "made it impossible for any fact finder reasonably to accept any part of it." *Herman*, 407 Ill. App. 3d at 707, 945 N.E.2d at 69.

¶ 46    We find *Herman* distinguishable. Although Amy at times confused the dates her specific injuries occurred and there were various inconsistencies in the testimony of the witnesses, those inconsistencies did not make it impossible for a fact finder to reasonably accept any part of Amy's testimony. Amy's testimony was also partially corroborated by Joyce's

testimony that she witnessed defendant choking Amy. It was further partially corroborated by LaRusso's admission to Daubs that he saw defendant hit Amy. Meanwhile, defendant's claim Brooks beat Amy was not "internally consistent, unimpeached and unrebutted." *Herman*, 407 Ill. App. 3d at 708-09, 945 N.E.2d at 70. To the contrary, as previously discussed, multiple witnesses contradicted defendant's claim, and his claim Brooks battered Amy could reasonably be perceived as fabricated. Daubs noted defendant seemed to be making up details during his interview, and Harold's testimony suggested defendant scripted Joyce's call to him. Amy also testified defendant coerced her to make the video in which she implicated Brooks. Defendant also notes evidence Amy lied about drug use or was affected by drugs at the time of the incident. But that factor also does not render it impossible for a jury to reasonably believe Amy's testimony defendant caused her injuries.

¶ 47        In sum, unlike in *Herman*, this case is not fraught with such inconsistencies and contradictions that no fact finder could reasonably accept any part of Amy's testimony. Ultimately, the issue of the credibility of the witnesses and the weighing of conflicts in the evidence were matters for the jury to determine. Accordingly, we find the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 48        Finally, we note defendant, without meaningful analysis, asserts one of his convictions must be reversed under the one-act, one-crime doctrine because the State failed to prove defendant committed more than one act of battery. Defendant did not raise the issue in the trial court and does not argue plain error applies on appeal. To preserve an issue for review, a defendant must raise an objection both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Although one-act, one-crime violations are reviewable as second-prong plain error, defendant has forfeited plain-error review by failing to

- 17 -

argue it. See *People v. Hillier*, 237 Ill. 2d 539, 545-46, 931 N.E.2d 1184, 1188 (2010) ("[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review."); *People v. Arrendondo*, 2023 IL App (2d) 220084, ¶ 37.

¶ 49 Forfeiture aside, defendant's argument still fails on the merits. The one-act, one-crime doctrine prohibits multiple convictions which arise from the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165, 938 N.E.2d 498, 501 (2010); *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844 (1977). When evaluating whether a conviction violates the one-act, one-crime rule, we must determine (1) whether the defendant committed multiple acts and (2) if so, whether any of the charges are lesser-included offenses. *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45; *People v. Rodriguez*, 169 Ill. 2d 183, 186, 661 N.E.2d 305, 306 (1996). We review *de novo* whether a defendant's convictions violate the one-act, one-crime doctrine. *People v. Csaszar*, 375 Ill. App. 3d 929, 943, 874 N.E.2d 255, 268 (2007).

¶ 50 Here, defendant claims both convictions were based on his single act of strangling Amy. However, the State charged and proved separate acts. One count pertained to strangulation, and the other pertained to great bodily harm. The State presented evidence of defendant's act of strangling Amy and also of multiple additional acts causing great bodily harm that occurred over multiple days. The charges here also did not involve lesser-included offenses. Accordingly, defendant's assertion the one-act, one-crime doctrine requires this court to vacate one of his convictions fails.

¶ 51                                    III. CONCLUSION

¶ 52 For the reasons stated, we affirm the trial court's judgment.

¶ 53 Affirmed.